ESTATE OF RALPH B. CAMPBELL, DECEASED (MABEL W. CAMPBELL, ADMINISTRATRIX), AND MABEL W. CAMPBELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2540–68, 2831–68.    Filed April 6, 1971.

*Charles R. Hembree, Dan E. Fowler,* and *Philip E. Wilson,* for the petitioners.

*Juandell D. Glass,* for the respondent.

1

2

---

[2] Sec. 292.380    *General provisions regarding registration of securities.*

\*        \*        \*        \*        \*        \*        \*

(2) The director may require as a condition of registration by qualification or coordination that (a) the proceeds from the sale of the registered security be impounded until the issuer receives a specified amount or (b) any security issued within the past three years, or to be issued, to a promoter for a consideration substantially different from the public offering price, or to any person for a consideration other than cash, be delivered in escrow to him or to some other depository satisfactory to him under an escrow agreement that the owners of such securities shall not be entitled to sell or transfer such securities or to withdraw such securities from escrow until all other stockholders who have paid for *their stock in cash shall have been paid a dividend or dividends aggregating not less than* six percent of the initial offering price shown to the satisfaction of the director to have been actually earned on the investment in any common stock so held. The director shall not reject a depository solely because of location in another state. In case of dissolution or insolvency during the time such securities are held in escrow, the owners of such securities shall not participate in the assets until after the owners of all other securities shall have been paid in full.

8

OPINION

RAUM, *Judge:* 1. *Sales of interests in service stock.*—There is no dispute between the parties that Campbell received his stock in The Oaks initially as compensation for services, and that such stock may properly be classified as "service stock." However, it is petition-

ers' position that such stock had only a negligible value when Campbell first became entitled to it, that it was completely unrestricted when he received it, that it became restricted only at a later time when it was placed in escrow or committed to be placed in escrow, and that the sale of his interests therein must be regarded as the sale of a long-term capital asset. The Government doesn't challenge the fact that the stock was held for more than 6 months, or that the stock otherwise qualified as a capital asset (apart from its contention that the stock was restricted when received), but it does contend that the stock was restricted when Campbell received it and that the sales of his rights to such restricted service stock resulted in the realization of ordinary income in accordance with regulations section 1.61–2(d)[4] and section 1.421–6(d)(2).[5] We hold for petitioners on this issue.

The Government argues that Campbell first acquired an interest in the stock on December 18, 1962, when it was subject to escrow and therefore was "subject to a restriction which [had] a significant effect on its value" within the terms of the regulations. Alternatively, it contends that even if August 1, 1962, be regarded as the date of acquisition, the stock was similarly burdened by reason of the plans and expectations to go forward with a public offering of The Oaks stock that would result in like restrictions on Campbell's shares. We reject these arguments as unsound. In the first place, under Kentucky law, Campbell became a stockholder as early as November 8, 1961, when he, together with Grissom and Pessin, as incorporators, filed the articles of incorporation with the secretary of state of Kentucky. Under Kentucky law, not only is an incorporator required to subscribe to at

---

[4] Sec. 1.61–2 Compensation for services, including fees, commissions, and similar items.
(d) *Compensation paid other than in cash*—* * *
    *        *        *        *        *        *
    (5) *Property transferred subject to restrictions.* Notwithstanding any other provision of this paragraph, with respect to any property, other than an option to purchase stock or property, which is transferred by an employer to an employee or independent contractor as compensation for services, and which is subject to a restriction which has a significant effect on its value, the rules of paragraph (d)(2) of § 1.421–6 shall be applied in determining the time and the amount of compensation to be included in the gross income of the employee or independent contractor. * * *

[5] Sec. 1.421–6 Options to which section 421 does not apply.
(d) *Options without a readily ascertainable fair market value.* * * *
    *        *        *        *        *        *        *
    (2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, and the amount of such compensation is the lesser of—
    (a) The difference between the amount paid for the property and the fair market value of the property (determined without regard to the restriction) at the time of its acquisition, or
    (b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable.

least one share of stock at the time of incorporation, Ky. Rev. Stat. sec. 271.035, but, upon issuance of the certificate of incorporation, those persons who have subscribed for shares prior thereto "shall be shareholders in the corporation," Ky. Rev. Stat. sec. 271.065. Moreover, we have recognized that "Generally, the issuance of a certificate is not necessary to constitute one a stockholder." *Wesley H. Morgan*, 46 T.C. 878, 890. And we stated further in that case (p. 890):

Also, the date of delivery of the certificate is not controlling as to the date a subscriber becomes a stockholder. The stock certificate is merely the documentary evidence of membership in a corporate organization and an attestation of the stockholder's ownership of shares of interest therein. * * *

See also *John E. Byrne*, 54 T.C. 1632, 1639. The case law in Kentucky is consistent with these views.[6]

In our view, not only did Campbell become a stockholder as early as November 1961, but he became the *sole* stockholder no later than the day in May or June 1962 when Grissom and Pessin assigned all their rights in the corporation to him. It was after those assignments that Campbell negotiated the "apportionment of rights" with the persons with whom he had become associated in seeking private financing for the project. His and their rights thus became fixed prior to August 1, 1962, when the first stockholders meeting was held and when that "apportionment" was formally recognized in the corporate minutes. Moreover, the "apportionment of rights" to these other persons flowed from Campbell's complete ownership of all rights in the corporation, and resulted merely in a *decrease* of his rights to stock therein, all of which he became entitled to before the plan for a public issue displaced the efforts to obtain private financing. In short, we find that Campbell's rights to the 615 shares of stock (out of the original authorization of 10,000 shares) that were formally allocated to him in the minutes of the August 1, 1962, meeting had been acquired by him at an earlier date free and clear of any restrictions. In such circumstances, the entire foundation for the Government's position collapses, and we must conclude that the 1963 and 1964 sales of Campbell's rights in the stock were capital transactions that did not result in the receipt of ordinary income in accordance with the regulations relied upon by the Government.

However, even if August 1, 1962, be regarded as the date when Campbell acquired his rights to the stock in question, we must still conclude that his shares were not *then* burdened with any restrictions. True, a public issue was then contemplated, but we cannot find that

---

[6] *Harlan National Bank* v. *Carbon Glow Coal Co.*, 289 S. W. 2d 200, 202 (Ky. App.); *Swaim* v. *Martin*, 302 Ky. 381, 388–389, 194 S. W. 2d 855, 859; *In re Penfield Distilling Co.*, 131 F. 2d 694, 698 (C.A. 6); cf. *Sargent* v. *Whitfield & Co.*, 226 Ky. 754, 760, 11 S. W. 2d 926, 929; and *Charles* v. *Hopkins*, 217 Ky. 842, 845, 290 S. W. 720, 721.

there was any commitment at that time for any such public issue. Rather the record indicates that private financing was still regarded as more desirable and would be employed, rather than public financing, if it should become available. It was only on September 11, 1962, that the contract with Eckley and Rose was executed, and it was also on that day that the articles of incorporation were amended to increase the number of authorized shares of capital stock to 1 million. Perhaps of even greater significance are the facts that the application for registration of the issue for public sale was filed as late as September 24, 1962, that the escrow agreement was executed and filed thereafter, and that the registration certificate was issued still later, on September 28, 1962. Plainly, Campbell's shares of stock were not restricted on August 1, 1962, the latest day on which, in our view, he could possibly have acquired his shares. We reject as wholly unsound the contention that he received them for the first time on December 18, 1962, when the reissued certificates, reflecting the 100-for-1 split, were sent to the Kentucky Division of Securities.

2. *Receipt of $8,217.91 unreported income from The Oaks in 1963.*— The 1963 joint return of the Campbells disclosed two items of income from The Oaks: (a) "commissions" in the amount of $7,500 against which a $902.50 deduction for "auto expense" was claimed, leaving a net of $6,597.50; and (b) "wages, salaries * * * " in the amount of $234.09. The Commissioner determined that in addition to the foregoing items Campbell received unreported income in the amount of $8,217.91 from The Oaks. The burden of proof is, of course, upon petitioners to show error in that determination, and in our judgment that burden has not been met.[7]

The record in respect of this item is both skimpy and murky. There was no convincing showing that Campbell did not receive any such funds from The Oaks, although petitioners seem to suggest if such funds were received they merely represented reimbursements of expenses incurred by Campbell on behalf of The Oaks. No such conclusion is reasonably possible on this record. We note not only that a $902.50 deduction for "auto expense" was claimed on the return, but also that the Campbells gave a "No" answer to the question "Did you receive an expense allowance or reimbursement, or charge expenses

[7] Petitioners contend, relying upon a Memorandum Opinion of this Court, *Estate of Matthew J. Nasdeo,* T.C. Memo. 1968–60, that their burden of proving that Campbell did not receive the income determined by the Commissioner "is much less than it would be in the case of a living taxpayer with the burden of proving a positive fact." Without entering upon any discussion as to what extent, if any, the burden may be lessened, it is plain that a burden nevertheless remains, and in our judgment the evidence presented on this issue was so unsatisfactory that we cannot find that the burden has been met however much the requirements of proof might be thought to be relaxed. Moreover, there was no showing that the books and records of The Oaks were unavailable; and it is quite conceivable that they might have cast considerable illumination upon this item.

to your employer?" The testimony of Campbell's accountant, who signed the return as preparer, to the effect that the "No" box was erroneously checked by a junior in his office had a hollow ring.[8] Whether Campbell had actually incurred any such expenses, the amounts thereof or the time or times when they were incurred, or whether he in fact made the type of itemized accounting therefor to The Oaks as required by section 1.162-17(b)(1) and (4), Income Tax Regs., so as to relieve him of the duty of reporting reimbursements for the expenses—all these remain a mystery to us on this record. We can conclude only that there has been a complete failure of proof. The Commissioner's determination must be sustained in respect of this item.

3. *The 1964 income tax return.*—The Commissioner determined that the 1964 income tax return signed and filed in the names of "Ralph B. and Mabel W. Campbell" was a joint return. Accordingly, he determined that petitioner Mabel W. Campbell, as well as the estate of her late husband, was liable for the deficiency in the tax computed on the basis of that return. Petitioner contends that the 1964 return was not a joint return and that therefore she is not liable for the deficiency in question. She emphasizes that she did not sign the return and urges that she did not authorize anyone to sign the return on her behalf. We uphold the Commissioner's determination.

We have found that petitioner did not sign the 1964 return. Nevertheless, it has long been settled that where an income tax return is intended by both spouses as a joint return, the absence of the signature of one spouse does not prevent their intention from being realized. See, e.g., *Myrna S. Howell*, 10 T.C. 859, 866, affirmed per curiam 175 F. 2d 240 (C.A. 6); *W. L. Kann*, 18 T.C. 1032, 1045, affirmed 210 F. 2d 247, 251 (C.A. 3), certiorari denied 347 U.S. 967; *Irving S. Federbush*, 34 T.C. 740, 757, affirmed per curiam 325 F. 2d 1 (C.A. 2); *Gertrude Abrams*, 53 T.C. 230, 234; *O'Connor* v. *Commissioner*, 412 F. 2d 304, 309 (C.A. 2), affirming on this issue a Memorandum Opinion of this Court, certiorari denied 397 U.S. 921.

The question of the spouses' intentions is one of fact. *O'Connor* v. *Commissioner*, 412 F. 2d at 309; *Federbush* v. *Commissioner*, 325 F. 2d at 2; *Joyce Primrose Lane*, 26 T.C. 405, 408; *Elsie S. Bour*, 23 T.C. 237, 239-240. On the basis of the record before us, we conclude that the Campbells intended the 1964 return to be a joint return. We note in particular that the Campbells customarily filed a joint return for each year other than 1964 from at least 1960 through 1966. Mrs. Campbell did not examine such returns; she simply accepted her husband's

---

[8] Moreover, having answered "No" to the question concerning whether they received an "expense allowance or reimbursement," the taxpayers left blank the next question on the return: "If 'Yes,' did you submit itemized accounting of all such expenses to your employer?"

preparation of the returns and signed them. Like the others, the 1964 return was filed as a joint return. The only significant difference was the absence of Mrs. Campbell's signature on the 1964 return.

Viewed in this context, the absence of her signature is hardly of overriding importance. Her signature on prior and subsequent returns appears to have been little more than a formal ritual as far as she was concerned. She left the responsibility for preparation and filing of the returns to her husband. She intended the returns to be filed as he chose. We conclude that Mrs. Campbell intended the 1964 return to be filed in the same manner as was each of the others: as a joint return.

Petitioner has relied primarily on *Elsie Januschke*, 48 T.C. 496, and *Alma Helfrich*, 25 T.C. 404. The facts of each of those cases are only superficially similar to those now before us. In neither case was there a finding that the wife customarily left the responsibility for making financial decisions to her husband or a finding that there had been a history of filing joint returns. Indeed, where there was a history of filing joint returns, it has been held that even a wife's outright *refusal* to sign in the particular circumstances did not preclude the return from qualifying as a joint return, *Irving S. Federbush*, 34 T.C. 740, 756–757, 758, affirmed per curiam 325 F. 2d 1 (C.A. 2) : [9]

Sylvia did not participate in the management and operation of the Federbush Company nor, according to the testimony, in any other business transactions. Irving looked after all such matters, and when he brought papers and documents to her for signature, it was, according to her testimony, her practice to sign them, "whether they were income tax returns or any other papers." * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The facts relating to the making and filing of the 1944 return are different, in that Irving signed Sylvia's name as well as his. * * * The record indicates that the 1944 return was prepared as a joint return in the same manner as the returns for other years. It so happened that when Irving presented the return to Sylvia for her signature they were experiencing some personal difficulties and she had refused to sign several other documents. She also refused to sign the return, 'and since the refusal was on the last day for the filing of the return, Irving signed her name to the return in her stead. There is no indication of record, even in Sylvia's own testimony, that her refusal to sign the return was because she did not wish to file a joint return or that she did not intend for it to have effect as a joint return * * *

Here, it has not even been suggested that petitioner refused to sign the 1964 return. Indeed, petitioner has offered no evidence whatever of a reason of any kind for not filing a joint return in 1964. Far from suggesting marital difficulties, the record indicates that after 1964 the spouses continued to live together, filing joint returns and enjoying

[9] The significance of a custom of permitting one spouse to make financial decisions on behalf of the other, coupled with a history of filing joint returns, was noted in *Philip R. Simms*, 27 T.C.M. 1570, 1573, 1578, affirmed per curiam 422 F. 2d 340 (C.A. 4), and in *Elizabeth J. Harris*, 20 T.C.M. 1676, 1680.

the benefits of their economic community until Mr. Campbell's death in 1967. Compare *Jack Douglas*, 27 T.C. 306, 313, affirmed sub nom. *Sullivan* v. *Commissioner*, 256 F 2d 4 (C.A. 5).

We note also that petitioner did not raise this objection with the examining agent during the audit of the 1964 return. In the context of this case, her subsequent attempt to discredit the 1964 return appears to us to be merely an afterthought. Cf. *Irving S. Federbush*, 34 T.C. at 755.

4. *Addition to tax under section 6653(a)*.—The Commissioner determined that an addition to tax should be assessed under section 6653(a), I.R.C. 1954, for underpayment of tax in 1963 "due to negligence or intentional disregard of rules and regulations." The burden of proof on this issue is upon petitioners. *Marcello* v. *Commissioner*, 380 F. 2d 499, 506–507 (C.A. 5); *Logan Lumber Co.* v. *Commissioner*, 365 F. 2d 846, 853 (C.A. 5); *Terry C. Rosano*, 46 T.C. 681, 688; *Byron H. Farwell*, 35 T.C. 454, 473. We have found that the burden was not carried.

While it is true that the failure to report the $5,000 received on the sale of rights to The Oaks stock did not result in any underpayment,[10] the situation is otherwise as to the $8,217.91 item of unreported income received from The Oaks. To be sure, we were left in the dark as to the precise nature of this item and were compelled to conclude that it represented taxable income in the absence of any satisfactory showing to the contrary. The burden nevertheless remains upon petitioners to establish error in the Commissioner's determination, and we cannot find on this record that he erred in respect of imposing the so-called negligence penalty under section 6653(a) to the extent that it related to this item.

*Decisions will be entered under Rule 50.*

---

[10] Since we have concluded that this item is to be classified as long-term capital gain and since there was an unused long-term capital loss carryover from a prior year that was more than sufficient to absorb this $5,000 gain, no underpayment of tax resulted from failure to report it.