EVELYN LEWIS SNYDER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Snyder v. Commissioner
Docket No. 13518-82.
United States Tax Court
T.C. Memo 1983-751; 1983 Tax Ct. Memo LEXIS 41; 47 T.C.M. (CCH) 667; T.C.M. (RIA) 83751; December 15, 1983. William J. Rubin, for the petitioner. Elizabeth S. Henn, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $73,089 in petitioner's 1978 Federal income tax. The issues for decision are (1) whether petitioner filed a joint return with her husband even though she refused to sign the return and (2) if petitioner filed a joint return, whether she is relieved of tax liability pursuant to the innocent spouse rules of section 6013(e). [1]
*42 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in baltimore, Md., when she filed her petition herein. Alvin Snyder (Alvin) and petitioner were married in 1949; Alvin moved out of the family residence in October 1979, several months after petitioner instituted an action for divorce. For the years 1949 through 1977, Alvin and petitioner intended to and did file joint Federal and state income tax returns; these returns were signed by both Alvin and petitioner. During the period Alvin and petitioner lived together, Alvin was involved in numerous business ventures, including, inter alia, serving as president and chairman of the board of a savings and loan association, holding and developing real estate, and practicing law (prior to his disbarment in 1975). [2] Petitioner's knowledge of Alvin's business ventures was extremely limited; when she asked Alvin about his ventures, she was told in no uncertain terms that it was none of her business. *43 Petitioner was employed during the first five years of her marriage to Alvin and her earned income was reported on the Snyders' joint returns. The relatively small amounts of unearned income received by petitioner on her personal savings accounts and investments were reported on the joint returns from 1949 to 1977 as well. Petitioner signed the joint returns for the years 1949 through 1977 without any real understanding of the returns' contents. She relied upon Alvin to file accurate returns and to pay any deficiencies. Alvin toook sole responsibility for dealing with respondent whenever the Snyders' joint returns were audited and never told petitioner the outcome of those audits. Petitioner's marital relationship with Alvin was less than ideal. Alvin was subject to a "nervous condition" which made his behavior unpredictable; [3] for example, a particular statement might be calmly received by Alvin on one day and yet set off a "complete rage" the next day. Petitioner contemplated divorcing Alvin in 1966 and again in 1976. However, in each instance, Alvin made promises which induced petitioner not to file for divorce. Nevertheless, the marital relationship continued to *44 deteriorate. In 1977, Alvin acquired a hotel in Atlantic City, N.J. Petitioner was very suspicious of Alvin's Atlantic City friends, who "carr[ied] guns" and "[h]ad bodyguards"; indeed, she suspected that if Alvin did not stay away from these people, it might jeopardize his attempt to get a pardon. See n. 2, supra. Petitioner's fears were exacerbated when Alvin's attorney in Atlantic City was murdered in what was described in the newspapers as the first post-legalized-gambling mafia hit. After petitioner expressed her concerns about Alvin's Atlantic City friends, Alvin spent far less time at home and far more time in Atlantic City. Finally, petitioner decided that she had had enough and, on March 9, 1979, filed for divorce. [4] Alvin strongly objected to a divorce and, when petitioner refused to drop the suit, he tried to intimidate petitioner. Among other things, Alvin threatened to leave petitioner penniless and he entered the marital home late at night and harassed her by, inter alia, *45 making a great deal of noise, setting off alarms, and turning the furnace up above comfortable levels. Petitioner became so terrified of Alvin that she had friends stay in the house with her at night. These actions occurred prior to August 15, 1979. After the divorce suit was filed, Alvin sought to have petitioner file a joint return with him for 1978. Petitioner refused to sign such return, because she had little knowledge of Alvin's financial affairs and did not want to subject herself to tax liability on Alvin's income. Alvin offered to hold petitioner harmless for any liability resulting from her signing the return but, in view of the existing animosity between petitioner and Alvin, petitioner did not find such a guarantee reassuring. On August 15, 1979, Alvin filed the 1978 tax return at issue herein. The return was signed only by Alvin; it was not signed by petitioner or anyone purporting to act on her behalf. Attached thereto was *46 a document, signed by Alvin, which stated, inter alia, that "I am unable to procure my wife's signature (Evelyn Snyder) at this time because of marital difficulties." Petitioner did not file a separate tax return for 1978 because she did not believe she had sufficient income to require her to do so. No return filed by Alvin since that time has been signed by petitioner or anyone purporting to act on her behalf. OPINION We must first determine whether the return filed by Alvin was Alvin's and petitioner's joint return. Because we find that petitioner has proven that she did not file a joint return with Alvin, we need not address the second issue -- whether petitioner is absolved, under the innocent spouse exception of section 6013(e), from liability for the deficiency asserted herein. The absence of petitioner's signature on the purported "joint" return is not conclusive evidence that petitioner did not file a joint return with Alvin. See Estate of Campbell v. Commissioner,56 T.C. 1 (1971); Federbush v. Commissioner,34 T.C. 740 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); Heim v. Commissioner,27 T.C. 270 (1956), *47 affd. 251 F.2d 44 (8th Cir. 1958). The critical question is factual -- did petitioner intend to file a joint return? See, e.g., Estate of Campbell v. Commissioner,supra at 12. Each of respondent's arguments as to why, on these facts, we should find that petitioner intended to file a joint return is without merit. Respondent's first contention is that the only reason petitioner refused to sign the joint return was to enhance her bargaining position in property settlement negotiations with Alvin. We disagree with respondent's contention for two reasons. First of all, we cannot agree with respondent that petitioner's testimony regarding her refusal to sign the return for fear of being liable on Alvin's potential tax liability was fabricated after the fact. Petitioner was a forthright and credible witness and we believe her. [5] While respondent is correct that 1978 was no different from any other year in terms of petitioner's knowledge of Alvin's business affairs, from the facts we have found, it is quite clear to this Court that petitioner was concerned that, since she was proceeding with the divorce action, Alvin would, despite any promise to *48 do so, not in fact assume full responsibility for any joint tax liability. [6] The present posture of this case, with additional taxes being asserted against petitioner in respect of Alvin's income while Alvin testifies as a witness for respondent, is ample proof that petitioner's fears as to the consequences of filing a joint return with Alvin were not groundless. Second, even if we were to find that the only reason petitioner refused to sign the return was to use this refusal as a "bargaining chip" in negotiating a divorce settlement, petitioner's motive for refusing to sign the return would not be determinative of whether there was an intent to file a joint return. See Anjoorian v. United States, an unreported case ( D.R.I. 1978, 43 AFTR 2d 79-340, 78-2 USTC par. 9837); Chilcote v. United States, an unreported case ( N.D. Ind. 1967, 20 AFTR 2d 5409, 67-2 USTC par. 9623). The seemingly contrary language in Federbush v. Commissioner,supra at 758, relied upon by respondent, must be read in the context of the fact that the taxpayer therein had the burden of proof [7] and this Court's observation that "There is no indication *49 of record, even in Sylvia's own testimony, that her refusal to sign the return was because she did not wish to file a joint return or that she did not intend for it to have effect as a joint return." Federbush v. Commissioner,supra at 757. Riportella v. Commissioner,T.C. Memo. 1981-463, also relied upon by respondent, is distinguishable because in that case we did not believe the wife and because of the peculiar facts which led respondent to determine that a joint return had not been filed. The same is true of Peirce v. Commissioner,T.C. Memo. 1982-154, because the wife therein told her husband that she intended to file "her version" of the joint return that her husband asked her to sign (indeed, she later told her husband that the joint return had been filed) and the version finally filed by her husband was "substantially the same" as "her version." *50 Respondent's second contention is that some of petitioner's income was included on the joint return and that this "proves" that petitioner intended to file a joint return. We find this fact inconclusive because petitioner did not ask Alvin to include her income on the return and did not give Alvin the documents pertaining thereto; [8] Alvin apparently acquired those documents when they were sent to the marital home. See generally Helfrich v. Commissioner,25 T.C. 404 (1955). Moreover, even if petitioner had given the documents to Alvin in January or February with the intent that they be incorporated in a joint return, that fact would be insufficient to establish that in later months, after the divorce proceedings had been instituted, petitioner had not acquired a significant reason not to file a joint return. See Garland v. Commissioner,T.C. Memo. 1977-373. Respondent's final contention is that petitioner's failure to file *51 a separate return, see section 6012, establishes an intent to file a joint return. However, it has long been established that failure to file a separate return, due to an erroneous belief that such a return need not be filed, will not, in and of itself, establish an intent to file a joint return with an estranged spouse. See, e.g., Groves v. Commissioner,T.C. Memo. 1957-196. We recognize that, where this Court finds a joint return was not filed by a petitioner, we have jurisdiction to determine his or her separate tax liability. See Stanley v. Commissioner,81 T.C. 634 (1983). Our examination of the record indicates that petitioner herein had insufficient taxable income to incur such separate tax liability and presumably this is the reason why respondent never raised the issue herein. Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. On February 3, 1975, Alvin was disbarred after he pleaded nolo contendere to violating 18 U.S.C. secs. 1006 (1961) and 1002 (1951) (receiving money from a Federal savings and loan association with intent to defraud; aiding and abetting) and 18 U.S.C. secs. 1001 (1948) and 1002 (1951)↩ (making a false statement of material fact in a statement to a government agency, the Federal Home Loan Bank Board; aiding and abetting).
3. Alvin was honorably discharged from the U.S. Navy in 1945, at his own request, because of his "nervous condition"; Alvin had previously experienced a nervous breakdown in 1940.↩
4. The first action for divorce was dismissed on technical grounds. A second action for divorce was filed on July 2, 1979. Subsequently, two additional suits have been filed. As of the time of trial, no final action had been taken.↩
5. We are not persuaded that petitioner's failure to give Alvin's attorney in the divorce proceedings a reason for not signing the purported joint return establishes that petitioner's only reason for refusing to sign was to exert bargaining power in the settlement negotiations. In Chilcote v. United States, an unreported case ( N.D. Ind. 1967, 20 AFTR 2d 5409↩, 67-2 USTC par. 9623), the Court gave no indication that, but for the wife's statement at the time the return was prepared that she would not sign the return because of the personal liability risk, it would have found intent to file a joint return. Moreover, one of the women staying with petitioner shortly after the divorce suit was filed testified that petitioner told her at that time that she was concerned about Alvin's potential tax liability.
6. For similar reasons, we reject respondent's contention that, since Alvin ran the Snyders' financial affairs and petitioner's signature on the return was a "formal ritual," the absence of petitioner's signature from the return is not significant in determining her intent not to file a joint return.↩
7. Since petitioner has clearly established that she did not intend to file a joint return, we need not discuss O'Connor v. Commissioner,412 F.2d 304, 309 (2d Cir. 1969), affg. in part, revg. in part, and remanding a Memorandum Opinion of this Court, in which the Second Circuit stated that the wife's failure to sign the return removed the presumption of correctness ordinarily attaching to the Commissioner's determination that a joint return was filed and shifted to the government the burden of producing additional evidence on this issue. See also Estate of Krock v. Commissioner,T.C. Memo. 1983-551↩.
8. Similarly, petitioner did not give Alvin the records of her charitable contributions for 1978. Petitioner has satisfied this Court that Alvin acquired, in some manner, the pertinent documents prior to March 9, 1979.↩