JOAN R. CARRICK, F/K/A JOAN R. TALARICO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LEONARD J. TALARICO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carrick v. Commissioner
Docket Nos. 16288-87, 17050-87
United States Tax Court
T.C. Memo 1991-502; 1991 Tax Ct. Memo LEXIS 551; 62 T.C.M. (CCH) 938; T.C.M. (RIA) 91502; October 2, 1991, Filed *551 Decision will be entered under Rule 155. John E. Riley, for petitioner Joan R. Carrick. Leonard Talarico, pro se. Michael Corrato, for the respondent. WELLS, Judge. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases, hereinafter referred to as the instant case, respondent determined deficiencies in Federal income tax and additions to tax as follows: Leonard J. Talarico and Joan R. Talarico (now Carrick)
Additions to Tax
Sec. [1]
Sec.
Sec.
Sec.
Year
Deficiency
6661
6653(b)
6653(b)(1)
6653(b)(2)
1981
$ 14,358.00 - 0 - $ 7,179.00
1982
15,401.00
$ 3,850.00
7,701.00 *
Leonard J. Talarico
Additions to Tax
Sec.
Sec.
Year
Deficiency
6654
6653(b)
1976
$ 3,137.70
$ 116.86
$ 1,568.85
1977
5,110.33
181.57
2,555.17
1978
22,134.33
706.59
11,067.17
*552 After concessions, the issues we must decide are: (1) Whether petitioners filed joint Federal income tax returns for taxable years 1981 and 1982; (2) if petitioners did file joint returns for such years, whether petitioner Joan R. Carrick is an "innocent spouse" under section 6013(e); and (3) if petitioners did not file joint returns for such years, whether petitioner Leonard J. Talarico is entitled to use joint return rates. FINDINGS OF FACT Some of the facts have been stipulated for trial pursuant to Rule 91. The stipulations of the parties are incorporated herein by reference. At the time they filed their petitions in the instant case, petitioners resided in New Jersey. Petitioner Joan R. Carrick (hereinafter Ms. Carrick) was born and raised in Brooklyn, New York. Following her graduation from high school Ms. Carrick worked in secretarial positions for approximately 2-1/2 years. She was married to Jim Carrick in 1951 and three daughters were born of their marriage. Except for a very short time at the beginning of her marriage, Ms. Carrick did not work outside the home during her marriage to Mr. Carrick. During 1964, the Carrick family moved from New York to Cherry Hill, *553 New Jersey. Mr. Carrick was employed with Airwick Company for the duration of their marriage. During the course of the Carricks' marriage, Ms. Carrick took no part in their family finances, never controlled a checkbook, and did not balance or reconcile checking or savings accounts. Each year during their marriage, the Carricks signed and filed joint income tax returns. Ms. Carrick, however, neither participated in the preparation of the returns nor assisted in the compilation or preparation of the material necessary for the preparation of the returns. Ms. Carrick signed the tax returns which had been prepared and presented to her by Mr. Carrick. During June 1975, Ms. Carrick was divorced from Mr. Carrick. During the divorce proceedings, petitioner Leonard J. Talarico (hereinafter Mr. Talarico) was a practicing attorney and became employed by Ms. Carrick. Mr. Talarico had been introduced to Ms. Carrick by her children. On June 25, 1977, Ms. Carrick married Mr. Talarico. Mr. Talarico's previous wife had died in 1974. Of that marriage three children had been born. When Mr. Talarico married Ms. Carrick, Mr. Talarico's children were grade school age. Upon her marriage to Mr. *554 Talarico, Ms. Carrick moved into the home that Mr. Talarico had shared with his first wife in Cherry Hill, New Jersey. After 1978, Ms. Carrick's two oldest children did not reside at the Cherry Hill, New Jersey, home. On June 4, 1984, Ms. Carrick and Mr. Talarico separated. Ms. Carrick filed divorce proceedings, which Mr. Talarico contested. In June 1985, following a trial in Camden, New Jersey, a decree of divorce was entered dissolving Ms. Carrick's and Mr. Talarico's marriage. After separating from Mr. Talarico, Ms. Carrick lived in an apartment for approximately 1-1/2 years. After November 1985, Ms. Carrick lived in a designated low income housing unit which she purchased for $ 45,000, having taken a $ 35,000 mortgage. Ms. Carrick was unemployed until February 1985, when she began clerical work at the Hospital of the University of Pennsylvania at $ 7.40 an hour. During the course of her marriage to Mr. Talarico, Ms. Carrick took no part in the Talarico family finances, never balancing or reconciling any checking or other bank account. Ms. Carrick depended on Mr. Talarico to provide her a weekly amount of cash, in the range of $ 200 to $ 250, to provide for general household *555 expenses. During her marriage to Mr. Talarico, Ms. Carrick's responsibilities involved staying at home to raise the children, clean the house, and cook. Mr. Talarico was responsible for all of the family's financial matters, including the checkbooks. During August 1980, Mr. Talarico established the South Jersey Paralegal Institute (the Institute). Ms. Carrick became a corporate officer of the Institute and had signature authority over the checking account, but she took no meaningful part in the affairs of the Institute. The Institute operated for 2 full years. Originally, Mr. Talarico planned for Ms. Carrick to take care of the books for the Institute, but after approximately 2 months of entering student payments in the books at home, Mr. Talarico took the books to an office at the Institute and Ms. Carrick had no further contact whatsoever with the operation of the Institute. On occasion, to pay family expenses, Ms. Carrick was instructed by Mr. Talarico to write checks from the Institute's checkbooks he left at the house. On other occasions, Ms. Carrick was instructed to write checks for family expenses from an estate which Mr. Talarico was representing. Mr. Talarico advised *556 Ms. Carrick that it was permissible for her to write checks on that estate account because any such checks would constitute his fee. Mr. Talarico also advised Ms. Carrick that she could write checks on the Institute checking account because he did not take a salary from the Institute. During the course of Ms. Carrick's marriage to Mr. Talarico, he gave her jewelry and they took "lavish" vacations, but most of such gifts and vacations occurred prior to the years in issue. Of the trips taken during the years in issue, at least two, ostensibly to Ms. Carrick, were business trips taken by Mr. Talarico in connection with the Institute on which Ms. Carrick accompanied Mr. Talarico. On numerous occasions, Mr. Talarico told Ms. Carrick that he earned in excess of $ 100,000 annually. During the course of her marriage to Mr. Talarico, Ms. Carrick neither took part in the preparation of any tax returns nor took part in preparing any financial information for inclusion in any returns. At trial, petitioner identified her signature on one tax return, the 1979 Federal income tax return. Ms. Carrick, however, did not review that return and only signed it upon Mr. Talarico's request. The Federal *557 income tax returns from 1981 and 1982 purport to bear the signature of Ms. Carrick, but they were not signed by her. On October 15, 1982, Mr. Talarico relinquished his license in lieu of formal disbarment proceedings. Mr. Talarico's explanation of that event to Ms. Carrick included a fictitious account of an occurrence involving David Kupets, a friend of Ms. Carrick's daughters. Ms. Carrick did not learn until after her divorce from Mr. Talarico that Mr. Talarico's disbarment arose out of the theft of funds from the Casey estate, one of Mr. Talarico's clients. During the course of Ms. Carrick's marriage to Mr. Talarico, Mr. Talarico frustrated Ms. Carrick's attempts to gain any knowledge of financial matters. In April 1980, Ms. Carrick sought professional psychiatric help in part due to her feeling that Mr. Talarico was not sharing financial information with her. Ms. Carrick complained to Mr. Talarico that she knew absolutely nothing about his insurance, bank accounts, and other financial matters and that in the event of his death she would not know about such matters. In response, Mr. Talarico told Ms. Carrick that if he died she could contact his brother for such information. *558 The deficiencies determined by respondent arise out of distributions from the Institute and misappropriation of client funds. The parties agree that such distributions represent taxable income to Mr. Talarico. Ms. Carrick had no knowledge of the misappropriation of client funds by Mr. Talarico. OPINION The first issue we must decided is whether petitioners filed joint income tax returns for taxable years 1981 and 1982. Sections 6013 and 6061 provide the statutory framework for joint returns. Section 6013(a) permits a husband and wife to file a joint Federal income tax return. For a return to qualify as a joint return, both spouses must sign it. Sec. 1.6013-1(a)(2), Income Tax Regs.Section 6061 requires that any return must be signed in accordance with the regulations. The regulations require both spouses, or their authorized agent, to sign a joint return. [2]Secs. 1.6013-1(a)(2), 1.6012-1(a)(5), Income Tax Regs. The liability of each spouse with respect to the tax arising from a joint return is "joint and several." Sec. 6013(d)(3); Davenport v. Commissioner, 48 T.C. 921, 926 (1967); Dolan v. Commissioner, 44 T.C. 420, 426-427 (1965). *559 Consequently, for respondent's determination that Ms. Carrick is jointly and severally liable for the deficiencies for taxable years 1981 and 1982 to be upheld, we must first decide whether the returns filed in 1981 and 1982 were joint returns. That question is one of fact. Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part and revg. and remanding in part T.C. Memo 1984-310; O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), affg. in part and revg. and remanding in part T.C. Memo 1967-174. The failure of one spouse to sign the return is not a bar to the Court's *560 holding that a joint return exists, if the nonsigning spouse intended to file a joint return. See Shea v. Commissioner, supra;Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971); Federbush v. Commissioner, 34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); Heim v. Commissioner, 27 T.C. 270, 273 (1956), affd. 251 F.2d 44 (8th Cir. 1958); Kann v. Commissioner, 18 T.C. 1032, 1045 (1952), affd. 210 F.2d 247, 251 (3d Cir. 1953); Howell v. Commissioner, 10 T.C. 859, 866 (1948), affd. per curiam 175 F.2d 240 (6th Cir. 1949). The Commissioner's determination generally has a presumption of correctness, and the taxpayer has the burden of proving it to be wrong. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). In the case of a spouse who does not sign a purported joint return, however, the presumption is removed, and the burden of producing additional evidence on the issue shifts to the Commissioner. O'Connor v. Commissioner, supra at 309. Accordingly, *561 while the ultimate burden of proof remains with petitioner, respondent bears the burden of going forward with evidence from which the Court can conclude that the nonsigning spouse intended to file the purported joint return. Esposito v. Commissioner, T.C. Memo 1991-262; Douglass v. Commissioner, T.C. Memo 1984-369. For taxable year 1981, respondent points to the purported signature of Ms. Carrick on the 1981 return, contending that, pursuant to section 6064, [3] such signature is prima facie evidence that she signed the return. At trial, however, Ms. Carrick testified that she did not sign the 1981 return. That return was prepared by Mr. Talarico and Ms. Carrick was counseled by her daughter, who being informed by Mr. Talarico of his "brown paper bag" method of preparing tax returns, strongly urged her mother to not sign any returns prepared by him. Ms. Carrick heeded that advice and did not sign the 1981 return. *562 Ms. Carrick saw neither the 1981 return nor the 1982 return until the preparations for trial of the instant case. She also testified that she never refused to sign either of such returns, but that was because Mr. Talarico did not show them to her. When asked by respondent's counsel if Ms. Carrick's purported signature on the 1982 return was in fact hers, Mr. Talarico testified, "I have reason to believe that it is, I have heard her deny it but I think it's her signature." When asked his reasons for believing it was her signature, Mr. Talarico testified, "Because to me it looks like her signature." Mr. Talarico also testified, however, that he did not recall seeing Ms. Carrick sign the 1981 return. Ms. Carrick's testimony that she did not sign the 1981 tax return was forthright and specific. Her reasons for not signing were supported by the testimony of her daughter. By contrast, Mr. Talarico's testimony was not convincing. Consequently, we hold that respondent has failed to produce sufficient evidence that Ms. Carrick signed the 1981 tax return. The issue of whether Ms. Carrick signed the 1982 tax return is not as difficult. Mr. Talarico acknowledged at trial that he signed *563 Ms. Carrick's name to the return. Accordingly, we hold that Ms. Carrick did not sign the 1982 return. Having concluded that Ms. Carrick signed neither the 1981 nor the 1982 tax returns, we turn to the issue of whether she intended to file a joint return with Mr. Talarico for taxable years 1981 and 1982. Respondent cites Estate of Campbell v. Commissioner, supra;Federbush v. Commissioner, supra; and Kann v. Commissioner, supra, in support of his position that Ms. Carrick intended to file joint returns for taxable years 1981 and 1982. The fact that Ms. Carrick had no significant history of actually signing and filing joint returns with Mr. Talarico distinguishes the instant case from the cases relied upon by respondent. In each of the cases cited by respondent, the spouse in each case had an established practice of signing and filing joint returns prior to and after the tax year at issue. [4] In the instant case, 1979 was the only taxable year in which Ms. Carrick actually signed and filed a joint income tax return with Mr. Talarico. Moreover, in those cases, strong circumstantial evidence lead to the conclusions that the nonsigning spouses *564 involved in those cases had tacitly consented to the filing of joint returns on behalf of such spouses. Respondent argues that Ms. Carrick's intent can be inferred from the fact that she never objected to or refused to sign the 1981 or 1982 returns. Respondent relies on Hennen v. Commissioner, 35 T.C. 747 (1961), for the proposition that a joint *565 return can arise out of Ms. Carrick's tacit consent to file a joint return on her behalf. Ms. Carrick's refusal to object to or sign the returns, however, is insufficient evidence to find that she tacitly consented to the returns. During the years in issue, the record indicates that Ms. Carrick did not work. While the record indicates that she may have owned a $ 20,000 certificate of deposit during the years in issue, respondent has failed to show that Ms. Carrick had any income which would require her to file tax returns for either of such taxable years. Ms. Carrick testified that she did not sign the 1981 or 1982 income tax returns and that she never would have signed them. Respondent points to Ms. Carrick's reliance upon Mr. Talarico to handle their financial affairs during the course of their marriage. From such reliance, however, we cannot infer that Ms. Carrick intended to file a joint tax return with Mr. Talarico. In fact, we infer the opposite. As we noted above, Ms. Carrick was advised by her daughter not to sign any return prepared by Mr. Talarico. Ms. Carrick was never presented with a tax return for 1981 or 1982 by Mr. Talarico to sign. Ms. Carrick was not aware *566 of any obligation for herself to personally file a tax return. The marriage was at a point where Ms. Carrick did not trust Mr. Talarico in his financial dealings because of his lack of disclosure. Respondent contends that Ms. Carrick's intent to file joint income tax returns for taxable years 1981 and 1982 can be inferred from the fact that she signed Forms 872, Consent to Extend the Time to Assess Tax, for taxable years 1981 and 1982, and that Ms. Carrick failed to raise the fact that Mr. Talarico had forged her signature on the 1981 and 1982 income tax returns during the divorce proceeding. The Court has considered such facts and they do not persuade the Court that Ms. Carrick intended to file joint income tax returns for taxable years 1981 and 1982. [5]
We note a case cited by Ms. Carrick, Cassity v. Commissioner, T.C. Memo 1987-181, *567 is factually analogous to the instant case. In Cassity, we held that a nonsigning wife had not intended to file a joint return with her husband. The nonsigning wife was a housewife, with only a high school level education, whose husband was an attorney. The nonsigning wife did not sign or review the income tax return for the years in issue. The husband avoided discussing business and financial matters with the wife, who was not knowledgeable about her husband's activities. The husband signed the wife's name on joint income tax returns. The wife was not consulted or advised by her husband about a joint return status or the fact that any return was filed for the years in question. Moreover, the wife did not have a continuous pattern of joint filing; the Court could find only one return that had been filed with the nonsigning wife's agreement. Like the wife in Cassity, and based on the foregoing, we hold that Ms. Carrick did not file nor intend to file joint income tax returns with Mr. Talarico for taxable years 1981 and 1982. We, therefore, find it unnecessary to address the issue of whether Mrs. Carrick qualifies as an innocent spouse under section 6013(e). Lastly, *568 we must decide whether Mr. Talarico is entitled to use joint return rates. A corollary to our finding that Ms. Carrick did not sign or intend to file a joint income tax return with Mr. Talarico for taxable years 1981 and 1982 is a holding that he is not entitled to joint return rates; and we so hold. Thompson v. Commissioner, 78 T.C. 558, 561-562 (1982). See Sebold v. Commissioner, T.C. Memo 1988-287. Accordingly, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on $ 15,401.00.↩
2. The regulations provide that a spouse or a third party may sign the return as an agent of the nonsigning spouse, if the nonsigning spouse is unable to sign the return by reason of disease or injury, continuous absence from the United States, or upon application to the District Director for good cause. Secs. 1.6013-1(a)(2), 1.6012-1(a)(5), Income Tax Regs.↩
3. Sec. 6064↩ states: "The fact that an individual's name is signed to a return * * * shall be prima facie evidence for all purposes that the return * * * was actually signed by him."
4. Kann v. Commissioner, 210 F.2d 247, 252 (3d Cir. 1953), affg. 18 T.C. 1032, 1043 (1952) (spouse signed and filed joint income tax returns 1 year prior to and 3 years after the years in issue); Estate of Campbell v. Commissioner, 56 T.C. 1, 12-13 (1971) (spouse had signed and filed joint income tax returns 4 years prior to and 2 years after the year in issue); Federbush v. Commissioner, 34 T.C. 740, 755 (1960), affd. per curiam 325 F.2d 1↩ (2d Cir. 1963) (spouse had signed and filed joint income tax returns 2 years prior to and 4 years after the year in issue).
5. See Januschke v. Commissioner, 48 T.C. 496, 500-501↩ (1967) (nonsigning spouse's execution of Forms 870-AD and 433 did not result in the giving of a tacit consent of filing a joint return).