MORRIS K. AND JUDITH S. EBELING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentEbeling v. CommissionerDocket No. 26668-88United States Tax CourtT.C. Memo 1994-277; 1994 Tax Ct. Memo LEXIS 275; 67 T.C.M. (CCH) 3102; June 16, 1994, Filed *275 Decision will be entered under Rule 155. Morris K. Ebeling, pro se. For respondent: James B. Ausenbaugh. FAYFAYMEMORANDUM OPINION FAY, Judge: Respondent determined deficiencies in income tax due from petitioners for the 1981, 1982, and 1983 taxable years as follows: Additions to TaxSec.Sec.Sec.Sec.YearDeficiency6653(b) 6653(b)(1)6653(b)(2)66611981$ 231,833.94$ 115,916.97-- ---- 1982214,789.33-- $ 107,394.671$ 53,697.331983206,298.62-- 103,149.31251,574.66After concessions by the parties, the issues 1 remaining for decision are: *276 (1) Whether petitioner Judith S. Ebeling (petitioner) 2 intended to file joint returns for the 1981, 1982 and 1983 taxable years. We hold that she did. (2) Whether petitioner is entitled to innocent spouse relief, pursuant to section 6013(e), for the years in issue. We hold that she is not. BackgroundSome of the facts of this case have been stipulated, and by this reference they are so found. The stipulation of partial settlement and the stipulation of facts and attached exhibits thereto filed by the parties are incorporated herein by this reference. Petitioner Morris K. Ebeling (Morris) resided at Federal Prison Camp, Boron, California, at the time the petition was filed. Petitioner resided at Sun Valley, Idaho, at the time the petition was filed. Petitioner is a college graduate who majored in interior design and art history at Maryville College, in St. Louis, Missouri. Morris and petitioner were married in 1964 and were still married in July 1993, at the time of trial. Morris and petitioner had four children together during their marriage. Petitioner was a housewife during the years at issue, but did not otherwise have *277 gainful employment through the years in issue. Petitioner was raised in a well-to-do family, was educated in private schools, and enjoyed an above-average standard of living while growing up. Morris was a tax attorney formerly admitted to practice law in the State of Missouri. In 1986 Morris became the subject of a criminal tax investigation which resulted in a criminal conviction, after Morris entered a guilty plea, for four criminal tax violations. The parties agree that Morris is liable, inter alia, for the fraud addition to tax under section 6653(b) in the amount of 50 percent of the underpayment for 1981; that there is an addition to tax for fraud under section 6653(b)(1) in the amount of 50 percent of the underpayment for 1982 and 1983; and that there is an addition to tax for fraud pursuant to section 6653(b)(2) for 1982 and 1983 in the amount of 50 percent of the interest due on the tax attributable to the adjustments entitled Rocky Mountain Investments, Zion and Faith Associates, and International Manufacturing and Equipment. It is stipulated that petitioner is not liable for these additions to tax. On May 22, 1981, Morris opened checking account No. XXX0659 at the Mercantile*278 Bank in Chesterfield, Missouri, under the name "International Manufacturing & Equipment Corp." (IME). On November 6, 1981, pursuant to Missouri law, Morris formed Rocky Mountain Investment Properties, Inc. (RMIP). On November 12, 1981, RMIP opened a checking account, account No. XXXX63-01, at Clayton Metro Bank in Clayton, Missouri. Morris was the only person authorized to draw checks on both the IME and RMIP checking accounts. During 1981, 1982, and 1983 Morris wrote checks from RMIP's checking account for his personal and family expenses in the amounts of $ >43,014, $ 153,367, and $ 172,501, respectively. Similarly, in 1981 and 1982 Morris wrote checks from IME's checking account for his personal and family expenses in the amounts of $ 36,617 and $ 39,304, respectively. The record also reflects that Morris wrote numerous checks from RMIP's and IME's checking accounts totaling $ 10,523.04, $ 58,801.46, and $ 72,947.41 in 1981, 1982, and 1983, respectively, payable to, and to pay for, the following items: American Express bills, Mastercard bills, various automobiles, a piano, a tennis court, a swimming pool, and the Bellerive Country Club. Morris and petitioner also purchased*279 a power boat in 1982 for a price in the range of $ 45,000 to $ 50,000. In addition to the foregoing, Morris and petitioner were responsible for the additional expenses of raising four children. During the years in issue, petitioner, Morris, and their children lived in a palatial 8,000-plus square-foot home surrounded by 25 acres and nestled in the hills of the exclusive Chesterfield, Missouri, community. This was the same property upon which the tennis court and swimming pool were added. 3Joint Federal tax returns were filed on behalf of petitioner and Morris for the*280 taxable years 1964 (the year Morris and petitioner were married) through 1985. The returns for these years were prepared by Morris, with Morris also signing petitioner's name to all returns, including the returns for the 1981, 1982, and 1983 taxable years. Morris and petitioner reported taxable income for 1981, 1982, and 1983 of only $ 5,191.54, $ 6,892.23, and $ 14,600.05, respectively. During 1981 petitioner owned certain shares of common and preferred stock of a corporation known as Schneithorst Realty Company (Schneithorst), which she had previously received as a gift from certain relatives. In 1981, Schneithorst redeemed petitioner's stock in exchange for a 15-year 11-percent promissory note in the amount of $ 200,000 and a check for $ 52,631.84, for a total of $ 252,631.84. Petitioner then deposited the $ 52,631.84 check with the Royal Bank of Canada, Freeport, Bahamas. Petitioner received taxable income in 1981, 1982, and 1983, representing the taxable portion of the long-term capital gain from the redemption of her Schneithorst stock (in the amounts of $ 21,134.48, $ 2,237 and $ 2,495, respectively), and interest income from her Schneithorst note (in the amounts of $ *281 7,309.18, $ 21,571.56, and $ 20,911.06, respectively). Petitioner reported the redemption of the Schneithorst stock on the 1981 return as follows: 6-12-62$  7,333.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,461.98$ 44,128.7060%$ 26,477.22$ 17,651.48 4In 1982 RMIP purchased two cashier's checks in petitioner's name. Petitioner then used these checks to buy a new Volvo automobile. The buyer's signature line, signed by petitioner, on the "Buyers Order and Invoice" contained in the record, and accepted by the Volvo dealership, indicates that the buyer of the new Volvo was "Rocky Mountain*282 Investment Prop [then partially unreadable] Judith Ebeling." Similarly, the "Extended Service Contract" purchased by petitioner to accompany the new Volvo indicated that the owner was, "Rocky Mtn. Investment Properties -- Judith Ebeling". At trial, however, petitioner claimed that she had purchased the Volvo for herself with her own money. 5*283 Petitioner filed Federal tax returns as married filing separate for the 1986, 1987, and 1988 taxable years, the years during which Morris was under investigation for criminal tax violations. The returns filed by Morris and petitioner in 1981, 1982, and 1983 report substantially all of petitioner's interest income and capital gains. These income and capital gain items were attributable solely to petitioner, and we find that petitioner provided the necessary information to Morris for purposes of reporting these items on the returns for the years in issue, thereby participating in the preparation of such tax returns. DiscussionAs an initial matter, we find petitioner's credibility questionable. Petitioner is an educated woman, and, while she is not trained in financial matters, we do not believe that she has as little knowledge about her own family's financial situation as she so contends. Her sophistication in financial matters is evidenced by her use of an offshore bank to deposit her proceeds from the Schneithorst stock redemption; her apparent injection of capital into RMIP with a corresponding purchase by RMIP of two cashier's checks in petitioner's name which were*284 thereafter used to buy the Volvo automobile in 1982, these transactions apparently enabling RMIP to take business deductions for otherwise personal expenditures of petitioner; 6 and her filing of separate returns for the years when Morris was under criminal investigation. These factors, coupled with petitioner's demeanor at trial, contradict her assertions that she had no knowledge of family financial matters. We conclude that petitioner was less than forthright during the course of these proceedings, whether such conduct was on her own initiative or due to Morris' urgings. A. Joint ReturnPetitioner argues, in essence, that the returns were signed and filed by Morris without her knowledge or consent and, therefore, were not joint returns. Respondent counters that petitioner did in fact intend to file joint returns for the 1981, 1982, and 1983 taxable *285 years. After review of the record, the Court finds that the record supports the conclusion that petitioner intended to file joint returns for the years in issue. The absence of one spouse's signature does not preclude joint return status if the spouses intended to file joint returns. Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971); Cassity v. Commissioner, T.C. Memo. 1987-181. The question of the spouses' intentions is one of fact. Estate of Campbell v. Commissioner, supra at 12. Where a spouse does not sign a return, a "tacit consent" rule applies to determine the nonsigning spouse's intent. Howell v. Commissioner, 10 T.C. 859, 866 (1948), affd. 175 F.2d 240 (6th Cir. 1949). It has been held that "where the husband * * * filed a joint return for himself and wife, without objection of the wife, who failed to file a separate return, it will be presumed the joint return was filed with the tacit consent of the wife". Carroro v. Commissioner, 29 B.T.A. 646, 650 (1933); see also Howell v. Commissioner, supra at 866;*286 Conley v. Commissioner, T.C. Memo. 1992-215. Factors to be considered in determining the existence of the nonsigning spouse's consent include the couple's history of filing joint returns, whether the nonsigning spouse received any of the benefits of the joint return, and whether the nonsigning spouse's income and expenses were reported on the joint return. Conley v. Commissioner, supra.Consent may be found where the signing spouse has been authorized to "take care" of all recordkeeping and Federal income tax return preparation and filing. Id.Petitioner relies heavily on Cassity v. Commissioner, supra, wherein the Court, considering a case with facts similar to those of the instant case, found that the taxpayer did not intend or tacitly consent to file a joint return with her husband for the taxable years in issue. We find, however, that Cassity is clearly distinguishable from the instant case. Petitioner had a history of allowing her husband to sign her name and file their joint returns for the 16 years immediately preceding the years in issue. Additionally, petitioner*287 had substantial income during the years in issue, the majority of which was reported on the returns filed for these years. The record reflects, and we so find, that petitioner intentionally relinquished responsibility for Morris' and petitioner's family's income tax matters to Morris. These facts, coupled with petitioner's failure to file her own returns for the years in question; her action of beginning to file married filing separate returns after Morris's criminal investigation began, thereby indicating an awareness of the obligation to file tax returns; and review of the record as a whole, lead the Court to conclude that petitioner did intend, either expressly or tacitly, to allow Morris to sign on her behalf and file joint returns for the taxable years at issue. B. Innocent SpousePetitioner argues that if the Court finds, as we do, that a joint return was in fact filed, then she is entitled to innocent spouse relief pursuant to section 6013(e). Respondent argues that petitioner is not entitled to innocent spouse relief for the years in issue. Section 6013(e) provides: (1) In General. Under regulations prescribed by the Secretary, if -- (A) a joint return has*288 been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.All of the statutory requirements must be met for the taxpayer to be afforded relief. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986). The burden of proof is on petitioner to prove that she satisfies each element of the requirements of section 6013(e)(1). Rule 142(a); Bokum v. Commissioner, 94 T.C. 126 (1990),*289 affd. 992 F.2d 1132 (11th Cir. 1993). The first requirement petitioner must meet is that she filed joint returns for the years in issue. As discussed above, we find that petitioner did in fact file joint returns with Morris; consequently, petitioner meets this requirement. The second requirement is that there be a substantial understatement of tax attributable to grossly erroneous items of Morris. The parties agree that this requirement has been met. The two remaining questions, then, are (1) whether petitioner knew or had reason to know of the omission of gross income, and (2) whether it would be inequitable to hold petitioner liable for the deficiency attributable to the omission. The Court concludes that petitioner did in fact benefit (beyond normal support) from the omissions from gross income and that it would not be inequitable to hold petitioner liable for the deficiencies in tax attributable to such omissions; therefore, petitioner does not qualify for innocent spouse relief pursuant to section 6013(e)(1). Because we decide this issue based on the equitable requirement, we do not address whether petitioner knew or had reason to know of the*290 omission from gross income. Petitioner argues, inter alia, that she had substantial funds of her own prior to the marriage; therefore, she did not benefit from the items of unreported income. Furthermore, petitioner asserts that there could be no benefit to her because she did not use the swimming pool, tennis court, racquetball court, piano, hot tub, or other amenities located at her palatial home. Respondent argues that petitioner has benefited from the omissions and that petitioner has failed to meet her burden of proving that it would be inequitable to hold her jointly liable. As previously stated, the Court agrees with respondent. In order to qualify for innocent spouse relief, petitioner must prove that, taking into account whether or not she derived significant benefits, beyond normal support, directly or indirectly from the omissions from gross income for each year in issue and considering all other facts and circumstances, it is inequitable to hold her liable for the deficiencies in tax attributable to the omissions. Sec. 6013(e)(1)(D); sec. 1.6013-5(b), Income Tax Regs.This Court has found a benefit to a taxpayer, whether direct or indirect, when the omitted income*291 helped the taxpayer to achieve a lavish lifestyle. For example, a benefit was found to exist where "Substantial amounts of money were spent for improvements to the family residence, for a swimming pool, automobiles and vacations." Church v. Commissioner, T.C. Memo. 1978-295. After a review of the record, the Court finds that the amounts expended by Morris from the RMIP and IME accounts were, for the most part, spent to maintain and support the lavish and luxurious lifestyle of the Ebeling family as a whole. Furthermore, the record reflects that petitioner and her family lived well above the standard of living which could be afforded on the negligible amount of taxable income reported each year. In addition to these expenditures, there were also substantial amounts of money spent on improvements to the Ebeling family's 8,000-plus square-foot home on its 25-acre estate, including but not limited to the swimming pool and the tennis court, not to mention the money spent to maintain a home this size with such expansive grounds. Finally, the omissions of income also went to pay for Morris' and petitioner's country club membership and dues, new automobiles, *292 a piano, and a power boat, to name but a few of the expenditures during the years in issue. The Court believes that petitioner did in fact benefit from the omissions of income during the years in issue, and, therefore, petitioner is not eligible for innocent spouse relief. Furthermore, while we do not base our decision solely on this, petitioner did fail to establish that any amount of the substantial funds she claims were hers prior to marriage were used to support the Ebeling family, or pay for her family's luxurious lifestyle. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes1. 50 percent of the interest due on $ 101,135.62.↩2. 50 percent of the interest due on $ 174,831.98.↩1. A statute of limitations issue is raised in the petition. Petitioner (see infra↩ note 2) did not present any evidence or make any argument relating to this matter; therefore, the Court will consider the statute of limitations issue abandoned.2. Although there are two petitioners in this case, Morris K. Ebeling (Morris) and Judith S. Ebeling, the issues remaining pertain to Judith S. Ebeling; thus, all references to "petitioner" are solely to Judith S. Ebeling, unless otherwise stated.↩3. Respondent asserts on brief that a racquetball court and a hot tub were also added to the property during the 1981 through 1983 period. Petitioner contends that the hot tub and racquetball court were added to the property prior to the years here at issue. We accept petitioner's contention; however, the Court finds that the money spent on maintenance and upkeep of these items originated from omitted items of income during the years in question.↩4. The record does not explain these calculations, but it is apparent that the $ 17,651.48 is meant to be Morris and petitioner's 1981 capital gain amount to be reported on their return. Interestingly enough, these calculations appear on the Schedule C worksheet for Morris's law practice rather than on a Schedule D. Furthermore, respondent argues, and we have found, that the amount of capital gain properly reportable in 1981 is $ 21,134.48.↩5. Petitioner's testimony in this regard went as follows: Q. * * * Speaking of cars, I believe during 1982 you purchased a new Volvo automobile.A. Right. Q. Do you remember that? A. Yes. Q. Do you remember how the funds came to you to purchase that automobile? A. It was from -- I don't remember if it was from my mother's or my grandmother's [inheritance]. It was from one of the trusts or -- that I received -- Q. Are you -- A. -- that I purchased it. Q. Are you certain that it wasn't in the form of two cashier's checks from Rocky Mountain Investment Company [sic]? A. Not to my knowledge, unless I somehow made a loan or something. It was from my mother's or my grandmother's account. Q. Mrs. Ebeling, I'm handing you what has been admitted as Joint Exhibit 338-LZ. On the front page there is a note, and it looks like it's filled out by the automobile dealer. It says, "Two Cashier's checks from Rocky Mountain Investment Company [sic]," payable to you. A. Uh-huh. Q. Does this refresh your memory? A. You know, to be honest with you, I [sic] really doesn't, because I had -- I thought all along that I purchased the car myself, that this was funds from my -- because I remember thinking that this was the first car I bought all by myself with my own money. Q. Okay. Thank you.↩6. The Court finds that this is a reasonable inference from the structure of the transactions, considering all the facts and circumstances of this case.↩