T.C. Memo. 2017-53

UNITED STATES TAX COURT

ALBERT OKOROGU AND RITA OKOROGU, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18025-14.                         Filed March 30, 2017.

<u>Akintunde Samuel Akintimoye</u>, for petitioner Albert Okorogu.

<u>Renato L. Izquieta</u>, for petitioner Rita Okorogu.

<u>Cassidy B. Collins</u> and <u>Christine A. Fukushima</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies of $14,826 and

$28,506 in petitioners' Federal income tax for 2011 and 2012, respectively.

Respondent also determined accuracy-related penalties pursuant to section 6662(a)

of $2,965.20 and $5,701.20 for 2011 and 2012, respectively.  Unless otherwise

**[*2]** indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions the issues for decision are: (1) whether respondent properly disallowed itemized deductions that petitioners claimed for 2011 and 2012; (2) whether respondent properly disallowed deductions for business expenses that petitioner Albert Okorogu (H) claimed in connection with his self-employment for 2011 and 2012; (3) whether petitioners received and failed to report cancellation of debt income of $3,009 for 2012; (4) whether H received and failed to report unemployment compensation of $15,300 for 2012; (5) whether petitioners are liable for the accuracy-related penalties under section 6662(a); and (6) whether petitioner Rita Okorogu (W) is entitled to innocent spouse relief under section 6015(f).

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. H resided in Nigeria and W resided in California at the time the petition was filed.

**[*3]** <u>Background on Petitioners' Marriage</u>

H and W met in Nigeria and married in 2004. At the time of their marriage, H worked as an optical engineer in California. W was a physician and worked at a teaching hospital in Nigeria. H returned to California after the wedding and W remained in Nigeria until 2006. In 2006, W and the couple's two young children moved to California to live with H.

W is and was at the time that she moved a proficient English speaker, but she could not work as a physician in the United States. W was a stay-at-home mother and homemaker for several years after she moved to the United States. Besides H and her children, W did not have any family members or close friends living in the United States during this time. H emotionally and physically abused W throughout their marriage, frequently in the presence of their children.

<u>Incidents of Abuse</u>

H was highly controlling of W's life inside and outside the home; in particular, he monitored and restricted W's social interactions. At some point in 2010 H "bugged the house" and he overheard W and her mother, who had come from Nigeria to visit her grandchildren, "gossiping" about him. When H returned home he beat W so badly that she had to be taken to the emergency room. W's back was broken and she could not walk normally for months.

**[*4]**   In another incident in 2011 H examined W's phone and discovered the phone number of a woman with whom he had forbidden W to speak.  H confronted W and started hitting her and choking her in front of their children.  W managed to get free and call the police and H was arrested on charges of domestic battery, child endangerment, and dissuading a witness.  W stated to police at this time that there had been "at least 10 separate domestic violence events in the home since 2006".

Following the 2011 incident W filed for and obtained a temporary restraining order against H.  W obtained several temporary restraining orders against H between 2011 and 2014, but she never followed up to obtain a permanent restraining order because she feared it would give H "a reason to become [even] more violent".  For the 2011 incident H was charged and found guilty of misdemeanor battery by the Los Angeles County Superior Court.

Control of Family Finances

H controlled all decisions regarding spending and family finances.  H did all of the shopping for the family, even picking out the clothes that W would wear.  Before 2012 H provided W with a debit card on which he imposed a $10 spending limit.  If W exceeded the $10 limit H would take away the debit card, take away W's car keys, and throw her out of the house and lock the door.  During this same

[*5] time H purchased for himself numerous new vehicles, including a Dodge Ram truck, a Range Rover, a Mercedes GL450, and a Volkswagen Phaeton, which he later had shipped to Nigeria.

H was highly secretive and routinely neglected to inform or consult W about matters that significantly affected their family finances. In 2007 H purchased a house in Valencia, California (Valencia house). County records show that after W and the children moved into the Valencia house W executed a quitclaim deed transferring her interest in the house to H as his sole and separate property. W does not recall ever being presented with or signing that deed.

In October 2010 H executed a grant deed that transferred the Valencia house to himself and another individual as "co-trustees of the Okorogu Family Trust". H executed two more grant deeds for the Valencia house in December 2010 and January 2011 to two more individuals also designated "co-trustees" of the family trust. H did not inform W about the transfers, and W did not know any of the individuals named in the grant deeds. Eventually H became unable to pay for the Valencia house, and H and W and the children were forced to leave.

**[*6]** W's and H's Employment and Income

Employment and Wages for Years in Issue

In September 2011 W began working full time at the University of California at Los Angeles (UCLA) as a clinical researcher. UCLA paid W wages of $21,068 and $60,390 in 2011 and 2012, respectively. W's job at UCLA ended in September 2013 when the grant providing for her employment ran out.

From at least 2006 until 2012 H worked as an optical engineer at the Aerospace Corp. (Aerospace) in El Segundo, California. Aerospace paid H wages and other compensation of $103,988 and $60,256 in 2011 and 2012, respectively. H was laid off by Aerospace in March 2012.

In addition to his employment at Aerospace H reported on his Federal income tax returns for 2011 and 2012 income and losses arising from business activity that he conducted through a sole proprietorship. In connection with this business H claimed deductions for various expenses, including advertising, contract labor, insurance, office expenses, supplies, taxes and licenses, travel, utilities, and other expenses. H reported net losses from his business activity of $37,892 and $72,717 for 2011 and 2012, respectively.

**[*7]**   Other Sources of Income for Years in Issue

In April 2012 H began receiving $450 per week pursuant to an unemployment insurance claim filed with the Employment Development Department (EDD) of the State of California.  The EDD issued H payments totaling $15,300 as unemployment compensation in 2012.

On April 30, 2012, Aerospace Federal Credit Union (credit union) sent a letter advising petitioners that they were delinquent in making payments on a Visa credit card debt.  Various attempts were made between May and October of 2012 to contact petitioners about the Visa credit card debt and to set up a repayment plan for this debt.  On November 20, 2012, the credit union discharged the outstanding debt of $3,009 on the Visa credit card and issued H a Form 1099-C, Cancellation of Debt, reporting that amount.  On November 28, 2012, the credit union sent H a "Statement of Credit Denial, Termination or Change" informing him that the credit union had charged off the Visa credit card debt.

W's Current Financial Difficulties

In May 2012 H left the United States and traveled back to Nigeria.  H made at least a couple of trips to the United States in 2012, and he also called regularly to speak to W and their children.  H currently resides in Nigeria.  W still resides in California with the children.

**[*8]** H has provided money to support W and the children on only one occasion since 2014. W is currently unemployed. As of the time of trial W depended on welfare and food stamps for support.

Petitioners' Tax Returns and the Notice of Deficiency

Before 2014 W did not know of any obligation to file a tax return with the Internal Revenue Service (IRS) reporting her income. W was not required to file formal tax returns in Nigeria, and H never informed her of the requirement to do so in the United States. Forms 1040, U.S. Individual Income Tax Return, electing the status of married filing jointly were filed timely for H and W for tax years 2011 and 2012. Although the returns for 2011 and 2012 purported to bear W's electronic signature, W did not participate in the preparation of these returns and did not sign them.

The returns for 2011 and 2012 reported H's and W's wages from their respective employment. Schedules C, Profit or Loss for Business, attached to the returns claimed deductions for business expenses and reported net losses for H's business activity for both years. The returns also claimed itemized deductions for H and W totaling $28,139 and $19,590 for 2011 and 2012, respectively. Schedules A, Itemized Deductions, attached to the returns claimed deductions for State and local taxes, personal property taxes, charitable contributions,

[*9] unreimbursed employee expenses, tax preparation fees, and other expenses. The return for 2012 did not report income from unemployment compensation or cancellation of indebtedness.

Respondent sent a notice of deficiency (notice) to petitioners on May 5, 2014. In the notice respondent disallowed all expenses claimed as deductions on Schedules C for H's business activity for 2011 and 2012. Respondent also disallowed Schedule A itemized deductions for personal property taxes, charitable contributions, unreimbursed employee expenses, and other expenses. Because the sum of the itemized deductions that respondent allowed was less than the standard deduction for each year, respondent adjusted petitioners' joint taxable income to allow the standard deduction. Respondent also determined that petitioners had received and failed to report unemployment compensation income of $15,300 and cancellation of debt income of $3,009, both for 2012. Other adjustments that respondent determined in the notice were later conceded.

W's Amended Petition

On August 1, 2014, petitioners filed a joint petition in this Court that was drafted by shared counsel. On February 4, 2015, the IRS received a completed Form 8857, Request for Innocent Spouse Relief, for W requesting relief from the tax liabilities determined in the notice. Because W filed the Form 8857 after her

**[\*10]** initial petition, the IRS did not issue a determination letter regarding her request for innocent spouse relief. See Chief Counsel Notice CC-2013-011, 2013 WL 3148998 (June 7, 2013).

On or around January 21, 2016, W obtained new counsel. Shortly thereafter W moved for and was granted leave to file a separate amended petition. In the amended petition W raised a claim to relief from joint and several liability under section 6015. Respondent concedes that W is entitled to relief and H disputes her entitlement.

OPINION

I.     Deductions Claimed for 2011 and 2012

Generally, taxpayers bear the burden of proving that the adjustments set forth in the Commissioner's notice of deficiency are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Specifically, taxpayers must prove their entitlement to claimed deductions. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers bear the burden of maintaining the records needed to establish their entitlement. See sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

**[*11]**  H alone was responsible for preparing the Forms 1040 that were the purported joint tax returns for himself and W, and W had no information or evidence relating to deductions.  H did not attend or testify at trial, and he presented no evidence to substantiate either the itemized deductions claimed for petitioners or the expenses claimed as deductions for H's business activity. Respondent's determinations in the notice regarding the itemized deductions and the business expense deductions are therefore upheld because of petitioners' failure to satisfy their burden of proof.

II.    Unemployment Compensation and Cancellation of Indebtedness Income

Gross income includes unemployment compensation and any discharge of indebtedness of the taxpayer.  Secs. 61(a)(12), 85(a).  In cases where the Commissioner determines that the taxpayer received and failed to report some item of gross income, the Commissioner bears the initial burden of producing at least minimal evidence linking the taxpayer to the income-producing activity or the receipt of funds.  Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). Once the Commissioner meets the burden of production, the burden of proof shifts to the taxpayer to produce credible evidence that he or she did not receive the alleged income or of proving that the Commissioner's deficiency calculations were not grounded on a minimal evidentiary foundation.  Id.; see also Fisher v.

[*12] Commissioner, T.C. Memo. 2014-219, at *7. We conclude that respondent's determinations are based on substantive evidence linking petitioners with the unemployment compensation and the discharge of indebtedness income.

The record contains a certified IRS Wage and Income Transcript (transcript) for H for tax year 2012. The transcript reflects that in 2012 the credit union issued H a Form 1099-C reporting debt discharged of $3,009 and the EDD issued H a Form 1099-G, Certain Government Payments, reporting unemployment compensation payments of $15,300. Additionally, respondent at trial produced certain business records of the credit union and the EDD. We received the records of the credit union into evidence without objection; H's counsel objected to the admission into evidence of the records of the EDD "on the basis of authentication, hearsay, best evidence rule, and lack of foundation".

H's counsel's primary objection to the introduction of the EDD records focused on an irregularity in a cover letter that accompanied the records. The cover letter is addressed to H and states that the attached summary of unemployment compensation payments was issued in response to a request made by H. Respondent's counsel stipulated at trial that the EDD records were not issued in response to a request by H and argued that this irregularity was due to

**[*13]** attempts by the EDD to conform with the interagency document request made by respondent.

In the light of H's objections, we reserved ruling on the admissibility of the EDD records and stated that H would have the opportunity to challenge the authenticity of those records as part of the posttrial briefing stage. Nothing in the record leads us to doubt that the EDD records are genuine. We accept respondent's counsel's explanation of the irregularity in the cover letter. The records are prefaced by a certification that complies with the authentication requirements of rule 902(11) of the Federal Rules of Evidence; and the records otherwise fit within the hearsay exception for records of a regularly conducted activity. See Fed. R. Evid. 803(6) (business records exception). We overrule H's objections and receive the records of the EDD into evidence.

H has not raised a reasonable dispute as to the items of income reported on the information returns. Absent a reasonable dispute, the transcript is sufficient to establish a minimal evidentiary foundation for respondent's determinations that H received and failed to report cancellation of indebtedness and unemployment compensation income. See sec. 6201(d); see also Hawkins v. Commissioner, T.C. Memo. 2008-168, 2008 WL 2736247, at *2-*3. The business records of the credit union and the EDD further substantiate the amounts of income and the dates that

[*14] H received them. Because petitioners produced no evidence to contradict the records supporting respondent's determinations, we sustain the income adjustments in the notice for unemployment compensation and discharge of indebtedness income.

III.    Section 6662(a) Accuracy-Related Penalties

Respondent determined for each of the years 2011 and 2012 that petitioners are liable for an accuracy-related penalty pursuant to section 6662(a). Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment of Federal income tax that is attributable to a taxpayer's negligence or a substantial understatement of income tax. Respondent asserts that petitioners had substantial understatements of income tax and that they were negligent in their underpayments for the years in issue. Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate. Sec. 6662(d)(2)(A). An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec.

[*15] 6662(d)(1)(A).  Five thousand dollars is greater than 10% of the tax that we conclude was required to be shown on petitioners' returns.  Respondent has met the initial burden of production because our conclusions as to the deficiencies result in the following substantial understatements:

| Year | Tax shown on Form 1040 | Tax required to be shown | Understatement |
|------|------------------------|--------------------------|----------------|
| 2011 | $2,229 | $17,055 | $14,826 |
| 2012 | 1,879 | 30,385 | 28,506 |

Because respondent has met the burden of production by showing that the understatements are substantial, we need not address the issue of negligence.  See sec. 1.6662-2(c), Income Tax Regs.

Once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, and he or she must come forward with persuasive evidence that the penalty is inappropriate.  Rule 142(a); Higbee v. Commissioner, 116 T.C. at 448-449.  The section 6662(a) penalty is inappropriate for any portion of the underpayment for which it is shown the taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  Whether the taxpayer acted with reasonable cause and in good faith is decided on a case-by-case basis, taking into account all pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.

**[\*16]** H did not testify at trial and there is otherwise no information in the record regarding how and under what circumstances the joint returns for H and W were prepared. Ultimately neither petitioner put facts forward to show that the penalties should not apply. Accordingly, respondent's determinations of the accuracy-related penalties are upheld.

## IV. W's Request for Innocent Spouse Relief

Married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). Generally, after making the election, each spouse is jointly and severally liable for the entire tax due for that taxable year. Sec. 6013(d)(3). However, a spouse who has made a joint return may elect to seek relief from joint and several liability under section 6015. Sec. 6015(a). We have jurisdiction to determine a requesting spouse's entitlement to relief under section 6015 where, as here, the spouse has raised the matter as an affirmative defense in a petition invoking the Court's deficiency jurisdiction under 6213(a). Maier v. Commissioner, 119 T.C. 267, 270 (2002), aff'd, 360 F.3d 361 (2d Cir. 2004).

At least a portion of the understatement of tax for each of 2011 and 2012 arises from disallowed joint itemized deductions, which are attributable in part to W; also, a portion of the understatement for 2012 arises from $16 of interest income that W concedes she received and failed to report. The parties therefore

**[\*17]** agree that W is not entitled to full relief from the deficiencies determined in the notice under either section 6015(b) or (c). If a requesting spouse is not eligible for relief under section 6015(b) or (c), he or she may be eligible for relief under section 6015(f). Sec. 6015(f)(2).

Section 6015(f) provides that a requesting spouse may be relieved from joint and several liability if "taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)". For determinations by the Commissioner, the statute directs that equitable relief be granted "[u]nder procedures prescribed by the Secretary". Sec. 6015(f)(1). Rev. Proc. 2013-34, 2013-43 I.R.B. 397, superseding Rev. Proc. 2003-61, 2003-2 C.B. 296, provides guidelines that the Commissioner follows in determining whether a requesting spouse qualifies for equitable relief under section 6015(f). We consider "all relevant facts and circumstances" in determining whether a requesting spouse qualifies for such relief. Sec. 6015(f)(1); Porter v. Commissioner, 132 T.C. 203, 210 (2009). This Court has considered the factors and analysis of Rev. Proc. 2013-34, supra, in prior cases decided under section 6015(f). See, e.g., Reilly-Casey v. Commissioner, T.C. Memo. 2013-292, at \*10 n.6; see also Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011) (employing analogous factors from Rev. Proc. 2003-61, supra).

[*18]  W asserts, and respondent concedes, that she meets the criteria for relief outlined by Rev. Proc. 2013-34, supra, and that she should be granted full relief from the liabilities determined in the notice.  However, before we render a determination on the merits of W's claim for equitable relief, we must determine whether the returns filed for petitioners for 2011 and 2012 were valid joint returns.  Equitable relief can be granted only for an individual who "has made a joint return".  Sec. 6015(a)(1); see also Rev. Proc. 2013-34, sec. 4.01(1), 2013-43 I.R.B. at 399.  H opposes our granting of equitable relief for W on the ground that the returns that he caused to be filed for himself and W for the years in issue were not valid joint returns.

In support of his position, H cites W's testimony and statements made on W's completed Form 8857 that she knew nothing of the preparation or filing of the returns for the years in issue, that her purported signature on the returns was a forgery, and that she was unaware of any tax reporting obligation at the time that the returns were filed.  H argues that because the 2011 and 2012 returns were not valid joint returns, the liabilities determined for those years should be redetermined on the basis of rates and allocation of income for married persons filing separately.  W and respondent argue that although W did not sign and did not expressly agree to H's filing of the returns for 2011 and 2012, the returns

**[*19]** were valid joint returns because W tacitly consented to the filing of joint returns by H.

Whether a joint return has been filed is a question of fact, the resolution of which depends upon the intent of the parties. Heim v. Commissioner, 27 T.C. 270, 273-274 (1956), aff'd, 251 F.2d 44 (8th Cir. 1958). To file jointly both spouses must intend to make a joint return. See Lane v. Commissioner, 26 T.C. 405, 408-409 (1956); Weber v. Commissioner, T.C. Memo. 1995-125, 1995 WL128456, at *3. The absence of the signature of one spouse does not necessarily preclude a finding of a valid joint return where the facts otherwise indicate that an income tax return was intended by both spouses to be a joint return. Hennen v. Commissioner, 35 T.C. 747, 748 (1961).

The "tacit consent rule" holds that the intent to file a joint return may be inferred from facts demonstrating that a nonsigning spouse tacitly approved or acquiesced in the other spouse's filing of the joint return. See, e.g., id.; Harris v. Commissioner, T.C. Memo. 1961-324, 1961 WL 565. This Court has considered a variety of factors in evaluating the issue of tacit consent, especially whether the nonsigning spouse filed a separate return, whether the nonsigning spouse objected to the other spouse's joint filing, and whether the couple's prior filing history indicates the intent to file jointly. See, e.g., Heim v. Commissioner, 27 T.C. at

[*20] 274; Howell v. Commissioner, 10 T.C. 859, 866 (1948), aff'd per curiam, 175 F.2d 240 (6th Cir. 1949); Carroro v. Commissioner, 29 B.T.A. 646, 650 (1933).  Thus, a history of reliance by the nonsigning spouse on the other spouse with respect to family financial matters, including the preparation of tax returns, suggests that the nonsigning spouse consented to the other spouse's filing of the return in question.  See Estate of Campbell v. Commissioner, 56 T.C. 1, 12-13 (1971).  Furthermore, the inclusion of income and deductions attributable to the nonsigning spouse on the return generally will be taken as proof of the intent to file a joint return, even where the nonsigning spouse failed to give his or her express consent to the filing.  See, e.g. Federbush v. Commissioner, 34 T.C. 740, 756 (1960), aff'd, 325 F.2d 1 (2d Cir. 1963); Acquaviva v. Commissioner, T.C. Memo. 1996-542, 1996 WL 724146, at *6.

The tacit consent rule has been described as an extension of the presumption of correctness that generally attaches to the Commissioner's determinations, specifically, a determination that a joint return was made despite the fact that one spouse failed to sign the return.  Hennen v. Commissioner, 35 T.C. at 749.  The returns that H prepared for 2011 and 2012 were each submitted with what purported to be W's electronic signature, and respondent accepted and processed the returns as the valid joint returns for H and W.  Accordingly, the notice issued

[*21] by respondent determined that H and W were jointly and severally liable for the deficiencies determined therein. Respondent has maintained the position throughout this proceeding that the returns submitted by H were valid joint returns.

H indisputably intended to file joint income tax returns with W for the years in issue. H was responsible for preparing the returns and for providing all of the information shown on them. By electing joint filing status H benefited from tax rates and other items available only to joint filers, and he claimed exemptions and other deductions attributable to the family unit. When the original petition was filed in this Court, H filed it jointly with W; at that time H did not contend that respondent's deficiencies should be redetermined on the basis that he and his spouse should be treated as married persons filing separately. H raised the argument that the 2011 and 2012 returns were not valid joint returns only following the filing of W's amended petition.

The situation here is unusual in that the spouse whose signature is not on the return is adopting it whereas the spouse who filed the return as a joint return attempts to disavow it. W has testified that the returns for 2011 and 2012 were prepared and filed entirely without her knowledge or consent, that she never looked at or signed those returns, and that she was not even aware at the time that

**[\*22]** those returns were filed that she had an obligation to report her income to the IRS.  W also testified that she is a "law-abiding citizen" and that she would have ensured that returns were filed for her for the years in issue had she known of the obligation to file.  Indeed, W testified that she would have signed the exact returns prepared by H had he presented them to her.

Perhaps because the facts of this case are so unusual, the parties have not cited and we have not found any authority directly in point.  Some guidance, however, may be found in O'Connor v. Commissioner, 412 F.2d 304, 308-309 (2d Cir. 1969), aff'g on this issue and rev'g on other grounds T.C. Memo. 1967-174. Late in the history of the controversy, the wife claimed that the returns in question were not joint returns. This Court and the Court of Appeals both recognized that the evidence was conflicting as to whether returns signed only by the husband and in his name were joint returns.  This Court reached the conclusion, and the Court of Appeals affirmed, that the returns were valid joint returns after balancing the evidence and giving greater weight to the inclusion on the returns of the wife's income, the spouses' filing of a joint petition in which they did not reject the Commissioner's joint treatment of them, the belated repudiation of joint return classification, and the husband's failure to testify although he "was in a position to

**[*23]** shed much light on his understanding of the returns and his wife's knowledge and approval thereof". Id. at 309.

W's failure to object to H's filing or to file separate returns for the years in issue may be explained by her ignorance, at the time, of any tax reporting obligation. However, we do not conclude that W's ignorance in this respect discredits her contention that she tacitly consented to H's filing for her for the years in issue. W's ignorance was due to H's conscious efforts to dominate family finances and to close her off from social interactions. W testified convincingly that she would have acquiesced in H's filing and signed the returns had H presented them to her at the time that he prepared them. In the light of W's testimony we cannot view her simple lack of knowledge of the filing requirement as evidence of any desire or intent not to file joint returns with H for the years in issue.

W's actions following the time that she learned of a tax reporting obligation are consistent with her assertion that she tacitly consented to the joint filings made by H for 2011 and 2012. When W filed a separate return for tax year 2013, she elected head of household status for herself, but she made no attempt to amend or resubmit the earlier return filed for her for 2011 or 2012. The record of W's administrative filings and her actions before this Court, including her amended

[*24] petition arguing that she is entitled to relief from joint and several liability, shows that she has consistently ratified and adopted the returns that H filed for the years in issue. See Ziegler v. Commissioner, T.C. Memo. 2003-282, 2003 WL 22255664, at *3.

On balance, the evidence leads us to conclude that W approved or at least acquiesced in H's filing of joint returns for 2011 and 2012. We conclude that W tacitly consented to filing joint income tax returns with H for 2011 and 2012 and that the returns filed for petitioners for those years were valid joint returns. Other than challenging the validity of the joint returns, H does not advance any argument that W fails to meet the conditions for equitable relief as prescribed in Rev. Proc. 2013-34, supra, and as applied by this Court in other cases. We agree with W and respondent that those conditions are met. See id. secs. 4.01, 4.02, 2013-43 I.R.B. at 399-400. Abuse and restricting access to necessary financial information are factors that strongly favor granting equitable relief under section 6015(f). See id. secs. 3.01, 4.01(7)(d), 4.02(3)(a), 2013-43 I.R.B. at 398-400; see also Hollimon v. Commissioner, T.C. Memo. 2015-157, at *8-*9.

W's testimony and supporting documentation that she provided establishes that she suffered from near constant emotional and physical abuse during the time that H lived with her and the children in California. H strictly and secretively

[*25] controlled the family's finances, and W reasonably feared his retaliation for any attempt to question or challenge his decisions. After H moved to Nigeria in May 2012, he continued to instill fear in and exercise control over W and the children. We accept W's testimony that she remains fearful of his retaliation to this day. H's counsel's attempts to discredit W's testimony to this effect, arguing that H was physically removed from the household and that W had control over her own bank account from May 2012 onwards, ignore the realities of an abusive relationship and the fact that H returned to California multiple times during this period. There is no evidence supporting H's arguments or contradicting W's testimony. His position in this case appears simply vindictive.

We have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit. To reflect the foregoing,

Decision will be entered

under Rule 155.
