T.C. Memo. 2021-137

UNITED STATES TAX COURT

OM P. SONI AND ANJALI SONI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15328-15.                    Filed December 1, 2021.

<u>Scott L. Kestenbaum</u>, <u>Richard Stephen Kestenbaum</u>, and <u>Jill S. Monoson</u>,
for petitioners.

<u>Christopher D. Davis</u>, <u>Michael J. De Matos</u>, and <u>Gennady Zilberman</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, <u>Judge</u>:  Respondent, the Commissioner of Internal Revenue,
determined a deficiency in petitioners' 2004 Federal income tax of $642,629, an

[*2] addition to tax under section 6651(a)(1)[1] of $28,836 for filing their return late, and an accuracy-related penalty under section 6662(a)[2] of $128,526. After concessions,[3] the issues for decision related to tax year 2004 are whether: (1) petitioners filed a valid joint return; (2) the period of limitations for assessment of tax under section 6501(a) and (c)(4) expired before the issuance of the notice of deficiency; (3) petitioners are liable for an addition to tax under section 6651(a)(1); and (4) petitioners are liable for the 20% accuracy-related penalty under section 6662(a). As explained below we find this case analogous to the phrase ignorance is bliss, except when it is not.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2]This penalty was added in an amended answer filed by respondent on July 12, 2017, alleging it applies because there was an underpayment due to either negligence or disregard of rules and regulations under sec. 6662(b)(1) or a substantial understatement of income tax under sec. 6662(b)(2).

[3]The Sonis conceded the $1,777,789 loss that was disallowed in the statutory notice of deficiency (SNOD) issued March 12, 2015. In his answer to petitioners' amended petition, respondent asserted an alternative argument that if we found the joint 2004 tax return was not a valid return, then the "statute of limitations remains open with respect to petitioner Om Soni due to fraud on the return." Respondent later conceded this alternative argument on brief.

[*3]                        FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated by this reference.  Om and Anjali Soni resided in New York when they timely filed their petition.

I.      General Background

The Sonis married in India in 1978 in an arranged marriage traditional to their culture.  Shortly thereafter, Anjali moved to the United States from India to be with her husband.  They have lived together at their current family home in New York since 1999.  Their son Kunal Soni also lived in the home during the year at issue.[4]

Om was an experienced businessman, and Anjali took care of the home at all relevant times.  Anjali viewed her marriage as traditional; she thought that her husband would always take care of her.  Throughout their marriage Om earned most of the household income, but at least some of their passive income was attributable to Anjali.  However, Anjali was not aware that any assets or accounts were held in her name or that she ever earned any income because she did not work outside the home.  She did not know how much her husband earned or what

---

[4]For clarity in this opinion each of the Sonis will be referred to by first name.  Any references to "the Sonis" mean Om and Anjali Soni, a married couple.

**[*4]** their monthly bills were.  Instead, Om handled all financial affairs; he did not discuss financial, business, or tax issues with Anjali.

The Sonis received mail at their home.  Certified mail was delivered at the door and regular mail was delivered into a mailbox outside their gate.  The housekeeper, Anjali, or other individuals who resided at their home would bring in the mail once a day.  Whoever brought in the mail would sort it.  If Anjali brought in the mail, she would typically just take out her magazines and other personal mail for herself, leaving the remainder of the couple's mail for Om.  Om did not review the couple's mail; rather, he had it bundled and sent out to his office.  His administrative staff would further sort it and attend to items for the Sonis, even those personal in nature.

II.    Om Soni

Om earned master of science degrees in chemical engineering and engineering sciences; he also held a master of business administration degree.  He worked in Fortune 500 companies before establishing several businesses of his own.  All of Om's businesses included very large accounting and finance departments.  He expected the staff of those businesses to take care of both business and personal matters, such as paying bills, preparation of income tax returns, and sending gifts.  He did not handle his own bank accounts or pay any of

**[*5]** his personal bills for 25 years.  He trusted his administrative staff to take care of such personal matters.

Between 2004 and 2005 Om's businesses acquired large debt loads.  Unfortunately, a subsequent market collapse created turmoil for his businesses.  One of his primary businesses declared bankruptcy in 2009, and by 2012 all of his businesses had failed.  Tax year 2012 was a trying year as Om was also indicted for embezzling from his businesses' section 401(k) plans.  He was eventually exonerated, but the litigation was time consuming and stressful for Om.

III.    Anjali Soni

Anjali lived a traditional but affluent lifestyle and chose to remain uninvolved with her family's financial matters.  In general she did not sign documents, such as tax forms, for fear they might be something nefarious.[5]  Because her uncle had stolen from her Indian family in the past by forging her father's signature on legal documents, she remained leary of signing documents and made it an ordeal to get her signature on any document.

---

[5]Anjali did not sign documents because she was concerned that they might be documents affecting her legal rights, for example, divorce papers.  She also did not like looking at legal documents or tax returns and would let them sit for days without attention.

**[*6]** However, Anjali was generally aware of U.S. tax return filing requirements. She was aware that they were paying tax but did not want to interfere with matters she perceived as her husband's responsibility. Anjali chose to not take part in the financial matters of the home, including tax matters. Since the time of their marriage, Anjali has never signed a tax return or asked anyone to sign a tax return for her. She did not pay attention to tax issues. Anjali fully expected and trusted her husband to handle all financial affairs, including all the tax matters.

IV.   Kunal Soni

The Sonis' son Kunal was married, and he and his wife also resided at the Sonis' residence. Kunal worked for his father and helped him with many different tasks. In particular Kunal discussed financial, legal, and tax matters with his father. Om would often give documents to Kunal for Anjali to sign. Kunal trusted his father, did not wish to engage with his mother for her signature, and therefore signed for his mother out of convenience.

**[*7]**   Over time, he signed his mother's name on six Forms 872, Consent to Extend the Time to Assess Tax, applicable in this case.[6]  He also signed the 2009 through 2013 Federal income tax returns for his mother.

Kunal had a good relationship with his parents and tried to act in their best interest.  However, he never told his mother that he had signed any of the tax documents; she in turn never asked about yearly taxes.  Kunal, like his father, did not discuss tax documents or other financial matters with his mother.

V.    Tax Return Preparation

The Sonis' 1999 through 2004 tax returns were prepared by an outside accounting firm in coordination with Om's businesses' internal accounting departments.  The tax records and the returns were maintained by those accounting departments.  At each yearend, a controller from one of Om's businesses and other accounting staff compiled and reviewed business records and personal records.  They then gave the outside accountants the information needed to prepare the Sonis' personal returns.  All returns were prepared selecting married filing jointly

---

[6]Kunal signed his mother's name on six of eight Forms 872, which collectively extended the assessment period of limitations for the 2004 tax return to December 31, 2015.  Kunal also signed a Form 2848, Power of Attorney and Declaration of Representative, appointing himself as representative for his parents and signed that form on behalf of his mother on December 17, 2015.  As discussed infra p. 29, this was after a meeting with Alan Grossman, Kunal, Om, and respondent's counsel.

**[*8]** status.  Om inspected and signed the returns but failed to follow through to see whether his wife had personally reviewed and signed them.

The 2004 tax return preparation and filing followed this protocol.  In particular for the 2004 tax return, Ralph Crisci from Ives & Sultan prepared the return.  Om's staff compiled and transmitted information to Mr. Crisci for the return with the exception of information related to the S corporation, Beauville Corp.  Om coordinated instead with Alan Grossman, a certified public accountant, to provide that information.  In 2004 the Sonis claimed a $1,777,789 loss deduction from Beauville Corp.  Mr. Crisci discussed the loss with Om and Mr. Grossman prior to the return being filed.  Mr. Crisci relied on representations from them that there was sufficient basis for the loss deduction.  Unknown to Mr. Crisci, Om's recordkeeping was poor, especially as it related to tracking his basis in Beauville Corp.

The Sonis received two extensions of time to file their 2004 Form 1040, U.S. Individual Income Tax Return.  The extended due date was October 17, 2005, because October 15, 2005, was a Saturday.  See sec. 7503.  Om signed the 2004 return on that date.  Anjali's signature is also dated October 17, 2005.  The return was mailed to the Internal Revenue Service (IRS) on November 10, 2005, and received by the IRS on November 14, 2005.

**[*9]** VI.　　The Sonis' Authorized Representative

An examination of the 2004 return ensued. On March 20, 2008, during that examination, the IRS received a Form 2848 authorizing Alan Grossman to act as the Sonis' representative. Through the year at issue and beyond, Mr. Grossman assisted with income tax and employment tax matters for Om and his businesses.[7] The Sonis' and Mr. Grossman's signatures on that Form 2848 were dated April 10, 2006. While a signature for Anjali was on Form 2848, Anjali did not personally sign the Form 2848.

Later on December 17, 2015, Om signed a Form 2848 which authorized Kunal to be his representative in addition to Mr. Grossman. Also on December 17, 2015, a Form 2848 authorizing Kunal to represent Anjali was received. Anjali did not personally sign that Form 2848.

VII.　Forms 872

Om became aware of an IRS examination of the 2004 tax return sometime in 2006. In connection with that examination and the ensuing appeal to the IRS

---

[7]Mr. Grossman was a certified public accountant with over 40 years of experience. Om met Mr. Grossman through a family friend, Mr. Shah. Om had previously provided funds to Mr. Shah and Mr. Shah's mother, Dhadra, to keep their businesses afloat. This included purchase money payments for the stock of Beauville Corp., an S corporation sold to him by the Shahs. Om did not ask for receipts or properly record the transactions with the Shahs.

**[*10]** Office of Appeals,[8] eight extensions to the period for assessment of tax were executed on behalf of the Sonis with respect to the 2004 tax year. Seven of the extensions were on Forms 872 and one was on Form 872-I, Consent to Extend the Time to Assess Tax as Well as Tax Attributable to Items of a Partnership.[9] The process related to the signing of those extensions was as follows: In January 2008 Mr. Grossman called the revenue agent (RA) conducting the IRS examination requesting that a Form 872 be sent to him. Because Mr. Grossman had no power of attorney on file, a Form 872 was instead sent directly to the Sonis on March 11, 2008 (first extension). On March 20, 2008 the IRS received a copy of the first extension signed by Mr. Grossman with a handwritten date of March 20, 2006, and also received the fully executed Form 2848 naming Mr. Grossman as the Sonis' representative. The first extension was countersigned by the Commissioner's representatives on April 14, 2008. The RA then mailed a copy of the fully executed first extension to the Sonis' residence and a copy to Mr.

---

[8]On July 1, 2019, Congress renamed the IRS Office of Appeals the IRS Independent Office of Appeals. See Taxpayer First Act, Pub. L. No. 116-25, sec. 1001(a), 133 Stat. at 983 (2019). The events in this case largely predate that change, so we use the name in effect at the times relevant to this case, i.e., the Office of Appeals.

[9]No partnership-level or S corporation-level items are in dispute. The question is whether the Sonis had sufficient basis in their S corporation stock in Beauville Corp. to deduct a flowthrough loss from that entity for 2004.

[*11] Grossman, as their representative. This first extension expanded the period for assessment of tax to June 30, 2009.

Because IRS records listed Mr. Grossman as the Sonis' representative, on January 6, 2009, the RA sent him a Form 872-I to extend the Sonis' 2004 period for assessment of tax again (second extension). The RA sent the Sonis the same form on January 7, 2009. On June 4, 2009, the RA received the second extension, which expanded the period for assessment of tax to June 30, 2011. The second extension was signed by Mr. Grossman as the Sonis' representative; he also signed both the Sonis' names on the form. Again the Commissioner's representatives countersigned and on June 9, 2009, the RA sent a copy of the fully executed second extension to the Sonis' home address. After the second extension, there were six additional Forms 872[10] that extended the period of limitations for assessment of tax to December 31, 2015. Om personally signed these additional

---

[10]A third Form 872, received by the IRS on February 14, 2011, extended the period for assessment of tax to June 30, 2012. A fourth Form 872, received on March 6, 2012, extended the period to June 30, 2013. A fifth Form 872, received on June 19, 2013, extended the period to June 30, 2014. A sixth Form 872, received on January 29, 2014, extended the period to December 31, 2014. A seventh Form 872, received on October 7, 2014, extended the period to June 30, 2015. An eighth and final Form 872, received on January 9, 2015, extended the period to December 31, 2015. Each of these six additional Forms 872 was countersigned by a representative of the Commissioner with an executed copy sent to the Sonis' home address.

[*12] six Forms 872; Kunal signed for his mother. Neither Om nor Kunal ever discussed any of the Forms 872 or 872-I with Anjali.

VIII. Notice of Deficiency and Tax Court Proceedings

The Commissioner issued the Sonis a SNOD on March 12, 2015. The only noncomputational deficiency adjustment made was the disallowance of a $1,777,789 flowthrough loss from Beauville Corp. deducted on the Sonis' 2004 income tax return because the Sonis could not substantiate their basis in that entity. Respondent also determined an addition to tax for late filing under section 6651(a)(1) of $28,836. The SNOD was also mailed to Mr. Grossman as the Sonis' authorized representative. The petition was timely filed on June 15, 2015.

IX. Accuracy-Related Penalty

Respondent asserted a section 6662(a) penalty for the 2004 tax year in an amendment to the answer lodged with the Court on July 12, 2017. The motion to amend was granted by order dated August 9, 2017. Respondent's counsel, Christopher Davis, made the initial determination to assert a penalty pursuant to section 6662(a) and (b)(1) and (2) for the Sonis' 2004 tax year. On July 12, 2017, Mr. Davis' immediate supervisor Gerard Mackey personally approved the determination in writing.

**[*13]**                              OPINION

There are four questions before the Court:  (1) whether the Sonis filed a valid joint return for 2004; (2) whether the period of limitations for assessment of tax expired before the issuance of the notice of deficiency; (3) whether the Sonis, either or both of them, are liable for an addition to tax under section 6651(a)(1); and (4) whether they are subject to a section 6662(a) penalty.  We will take each in turn.

I.      Joint Return

A.      Burden of Proof

As a general rule, the Commissioner's determination of a taxpayer's liability is presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In certain circumstances the burden of proof may shift to the Commissioner where the "taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer."  Sec. 7491(a)(1).  Credible evidence is evidence that, upon critical analysis, would constitute a sufficient basis for deciding the issue in favor of the taxpayer if no contrary evidence were submitted.  Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (citing H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747,

- 14 -

**[\*14]** 994-995). The taxpayer bears the burden of proving that the requirements of section 7491(a) have been met. Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Anjali did not sign the 2004 tax return. A spouse's failure to sign the return removes the presumption of correctness ordinarily attaching to the Commissioner's determination of jointness. O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), aff'g in part, rev'g in part and remanding T.C. Memo. 1967-174. Consequently, where a spouse does not sign a purported joint return, the Commissioner bears the burden of producing evidence that a joint return was intended. Id. Because Anjali did not sign, respondent bears the burden to show that the return was filed jointly.

B.    Tacit Consent

Because Anjali did not personally sign the return, we must determine whether it was nonetheless filed jointly.[11] Section 6013(a) permits a husband and wife to file a joint return. Spouses who elect to file a joint return for a tax year are required to compute their tax on the aggregate income of both spouses, and both spouses are jointly and severally liable for all tax due. Sec. 6013(d)(3);

---

[11]We note that if a joint return was not filed, Anjali did not otherwise file a return for the 2004 tax year and the period of limitations for assessment for that year would remain open indefinitely for Anjali. See sec. 6501(c)(3).

[*15] Harrington v. Commissioner, T.C. Memo. 2012-285, at *4. Whether an income tax return is a joint or separate return is a question of fact that depends on the intent of the parties. Heim v. Commissioner, 27 T.C. 270, 273-274 (1956), aff'd, 251 F.2d 44 (8th Cir. 1958). Consequently, married filing jointly status does not apply to a return unless both spouses intended to make a joint return. See Lane v. Commissioner, 26 T.C. 405, 408-409 (1956); Weber v. Commissioner, T.C. Memo. 1995-125, 1995 WL 128456, at *3.

The failure of one spouse to actually sign does not necessarily negate the intent to file a joint return by the nonsigning spouse. Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971); Hennen v. Commissioner, 35 T.C. 747, 748 (1961). Intent may be demonstrated through tacit consent; the "tacit consent rule" holds that the intent to file jointly may be inferred from the acquiescence or tacit approval from the nonsigning spouse. Hennen v. Commissioner, 35 T.C. at 748; Okorogu v. Commissioner, T.C. Memo. 2017-53, at *19. This Court has considered a variety of factors in deciding the issue of tacit consent, including whether the nonsigning spouse filed a separate return, whether the nonsigning spouse objected to filing jointly, and whether the prior filing history indicates the intent to file jointly. Okorogu v. Commissioner, at *19-*21; see also Heim v. Commissioner, 27 T.C. at 274; Howell v. Commissioner, 10 T.C. 859, 866 (1948),

**[*16]** aff'd per curiam, 175 F.2d 240 (6th Cir. 1949); Carroro v. Commissioner, 29 B.T.A. 646, 650 (1933). Additionally, a pattern of relying on one's spouse to handle the family's financial matters, including preparation of tax returns, suggests that the spouse consented to the other spouse's filing of the return. Estate of Campbell v. Commissioner, 56 T.C. at 12-13; Okorogu v. Commissioner, at *20.

Overall, "[t]he tacit consent rule has been described as an extension of the presumption of correctness that generally attaches to the Commissioner's determinations, specifically, a determination that a joint return was made despite the fact that one spouse failed to sign the return." Okorogu v. Commissioner, at *20. Moreover, a joint return has been upheld where no part of the spouse's signature on the return was in the spouse's handwriting. Estate of Campbell v. Commissioner, 56 T.C. at 13.

The Sonis argue that the "tacit consent rule" should not apply in this case because Anjali's signature was signed by someone else, as opposed to the return's signature line being left blank. This is contrary to our holding in Estate of Campbell. Id. Furthermore, the Sonis argue that the tacit consent rule does not apply in this case because we must look to the facts and circumstances. We agree that it is a facts and circumstances determination. See Heim v. Commissioner, 27 T.C. at 273-274.

**[\*17]** The Sonis have been married since 1978. Throughout their marriage, Om took care of the family finances and Anjali handled the home matters. Anjali enjoyed an affluent lifestyle and chose not to be involved in her family's finances or tax preparation. Consequently, Anjali believed and continues to believe it is her role to trust her husband with the financial matters for the couple. Anjali stated that "[w]e've been taught your husband always takes care of you. He does the right thing, and you've got to trust him. My mother did that. My grandmother did that. We all do that." Therefore in her role with the family, Anjali did not discuss financial matters including tax preparation because that was left up to her husband.[12]

For tax years 1999 through 2003 the Sonis filed jointly. The record shows that for tax years 2005 through at least 2014 they continued to file jointly. As of the date of trial, the Sonis had not yet filed for tax years 2015 through 2017. The 2004 return was prepared and filed as a joint return. For all years the process for

---

[12]Although she testified that she did not sign documents because long ago her daughter warned her it could be a divorce paper, "so I don't sign any papers," she went on to testify, when asked if she trusted her husband to handle all of the tax issues: "I did. I do. I will." Anjali continued to state that she trusted him with handling the U.S. tax obligations, testifying: "I trust him with everything. Yes, I do. I don't know what this pertains, but whatever, right, wrong, I trust him." When asked a followup question regarding whether she agreed to his dealing with the IRS, she stated: "We don't talk about it, but whatever he does, I do trust him. I never discuss his business with him."

[*18] preparing the returns was the same. The information for the returns was gathered by the accounting departments of Om's businesses and sent to an outside accounting firm to prepare. All returns were then reviewed by personnel in Om's businesses before submission to him for filing. Om reviewed and signed all returns. He generally asked his son or a staff member to get Anjali's signature. However, the record is unclear as to who signed the 2004 tax return for Anjali. While Anjali did not personally sign the 2004 return, this was standard practice of their tax return preparation. Consequently, Anjali chose to trust her husband's handling of their family's finances, which included preparation and filing of their tax returns, including the 2004 tax return.

But that is not the end of our inquiry; other factors this Court considers are whether Anjali objected to filing jointly or made any attempts to file separately. See, e.g., Heim v. Commissioner, 27 T.C. at 274; Howell v. Commissioner, 10 T.C. at 866; Carroro v. Commissioner, 29 B.T.A. at 650. Anjali had not taken any affirmative actions, filed any separate returns, or made attempts to disavow the joint status of the 2004 return before the date of trial. She had access to and frequently brought in the family mail and would have seen bills, financial accounts, and IRS notices in the mail. Many of those notices were addressed to her or to her and her husband jointly. She was aware that they had a tax filing

[*19] obligation in the United States; however, she testified that she did not "really pay attention" to tax issues and felt she was "just out of the whole system." She chose to let other family members handle those issues. Anjali did not make any attempts at filing separately from Om. She trusted Om to handle the tax matters.

On balance, the evidence leads us to conclude that Anjali approved or at least acquiesced in the joint filing of their 2004 return. Anjali did not discuss financial matters with her husband or her son. She was generally aware of the U.S. tax system but chose not to engage. Anjali relied on and continues to trust her husband and son to handle the tax matters, including their Federal income tax returns. Anjali was not interested in viewing the contents of the return; she viewed it as her husband's responsibility for the family.[13] Anjali had the opportunity to take affirmative steps upon receiving notices. However, she did not take any affirmative steps in attempting to file separately or object to the 2004 return. Overall, Anjali repeatedly reiterated that she fully trusted her husband and son to handle the financial issues for her. Anjali chose to let others handle all of her affairs for her. It was part of her arrangement with her husband that he handle

---

[13]She testified that she would let documents like tax returns sit "for days and days and days. Because I don't feel like reading papers like this, and I wouldn't look at it."

**[\*20]** all of their tax-related matters.  Therefore, she tacitly consented to filing the 2004 return jointly.

II.  Period of Limitations for Assessment of Tax

Petitioners contend that the period of limitations for assessment of tax[14] expired before the IRS mailed the SNOD.  Ordinarily, the Commissioner must assess a tax deficiency within three years of the date the return was filed.  See sec. 6501(a).  The Commissioner must mail the SNOD before he may assess a deficiency.  See sec. 6213(a).  If the Commissioner mails the SNOD, the period of limitations for assessment is suspended.  See sec. 6503(a)(1).  Therefore, for the SNOD to fall within the period of limitations for assessment, the Commissioner had to mail it to the Sonis before the date that was three years after they filed their 2004 Federal income tax return.  However, the period can be extended by a written agreement before the expiration of that period.  Sec. 6501(c)(4)(A).

---

[14]The period of limitations also applies to additions to tax and penalties, and any reference to the extension for assessment of tax deficiency also includes the applicable additions to tax and penalties.  Secs. 6501(a), 6651, 6662; see Leach v. Commissioner, T.C. Memo. 1993-215, 1993 WL 166944, at \*3 (showing the application of sec. 6501 and sec. 6651(a)(1) addition to tax, noting that when a taxpayer fails to file a return "the period of limitations does not bar assessment of the deficiency and additions to tax"); see also Balice v. Commissioner, T.C. Memo. 2009-196 (applying sec. 6662(a) penalty within the sec. 6501 period of limitations for assessment).

**[*21]** The Code treats married taxpayers who file jointly as one taxable unit; however, it does not convert two spouses into one single taxpayer. Spouses filing a joint return are separate taxpayers, and each spouse has an absolute right to extend or not extend the time within which to assess. Dolan v. Commissioner, 44 T.C. 420, 427-428 (1965). A waiver to extend the period to assess a deficiency is valid only as to the spouse who signs the waiver. Tallal v. Commissioner, 77 T.C. 1291, 1295 (1981).

The expiration of the period of limitations for assessment is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability. Rules 39, 142(a); Mecom v. Commissioner, 101 T.C. 374, 382 (1993), aff'd without published opinion, 40 F.3d 385 (5th Cir. 1994); Heckman v. Commissioner, T.C. Memo. 2014-131, at *10-*11, aff'd, 788 F.3d 845 (8th Cir. 2015). To establish this defense, taxpayers must make a prima facie case showing the date they filed their return, the expiration date of the period of limitations based on that filing date, and receipt or mailing of the SNOD after the running of that period. Coleman v. Commissioner, 94 T.C. 82, 89 (1990); Adler v. Commissioner, 85 T.C. 535, 540 (1985); Robinson v. Commissioner, 57 T.C. 735, 737 (1972). The Sonis filed their 2004 return in 2005 and the SNOD was not mailed until March 2015, which is past the period of limitations for assessment.

**[*22]** Where the Commissioner has issued the SNOD to a taxpayer beyond the three-year period, the burden of going forward is on respondent to show that the taxpayer executed one or more written agreements extending the period of limitations on assessment and that the SNOD was mailed before the end of the extended period. See Hernandez v. Commissioner, T.C. Memo. 1998-46, 1998 WL 44090, at *4, supplemented by T.C. Memo. 1998-329. In this written agreement between the Commissioner and the taxpayer both parties are agreeing the limitations period will be extended. Sec. 6501(c)(4). If respondent can show a facially valid extension existed, then the burden going forward shifts back to the party pleading the affirmative defense to show that the alleged exception to the expiration of the period is invalid or otherwise inapplicable. Adler v. Commissioner, 85 T.C. at 540.

In the Sonis' case the IRS received eight Forms 872 that were facially valid and signed by either the Sonis or Mr. Grossman, whose power of attorney was on file. The Forms 872 were each signed within the period of limitations for assessing the deficiency, as extended, and would have extended the overall period of limitations for assessment to December 31, 2015. The SNOD was sent in March 2015. Respondent has met the burden showing that the SNOD was sent within the extended period of limitations for assessment. Because the Sonis assert

**[*23]** that the first two extensions were invalid, the burden shifts back to them to prove that the extensions were in fact invalid.

    A.    First and Second Extensions and the Form 2848

An agreement to extend the period of limitations on assessment reached under section 6501(c)(4) is a waiver of the limitations defense by the taxpayer; it must be in writing. Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983). A signed Form 872 embodies such a written waiver. The Sonis argue that the three-year period of limitations for the assessment of tax bars assessment after November 10, 2008, because the first two extensions, one on Form 872 and the subsequent one on Form 872-I,[15] were signed by Mr. Grossman without their authorization. We now turn to whether this argument holds true.

        1.    Form 2848

The Sonis argue that Mr. Grossman did not have authority to agree to the first extension because they had not signed the Form 2848 authorizing him to be

---

[15]The consent to the extension of the three-year period is often made in some version of the Form 872. Sec. 6501(c)(4); see sec. 601.105(f), Statement of Procedural Rules. Form 872-I allowed for the extension of the period for assessment of tax with respect to both partnership items and nonpartnership items. Form 872-I (February 2005); see also Internal Revenue Manual (IRM) pt. 4.31.2.6.3(3)(b) (Mar. 4, 2008). The IRM directed agents to use a Form 872-I if "the examiner is uncertain as to the TEFRA status of any partnership in which the taxpayer has invested". IRM pt. 25.6.22.4.3(1) (Mar. 1, 2008). On October 30, 2009, Form 872-I became obsolete. IRM pt. 8.21.3.1.3.4 (Aug. 28, 2014).

[*24] their representative. Section 6064 provides that an individual's name signed on a document "shall be prima facie evidence for all purposes that the * * * document was actually signed by him." The Form 2848 authorizing Mr. Grossman to act on the Sonis' behalf looked facially valid, as it appeared they had signed it. We now know Anjali did not personally sign Form 2848, but gave implied consent for others to sign for her. Om likewise contends that the signature on the Form 2848 was not his. To prevail on this point the Sonis must offer evidence sufficient to overcome the presumption of authenticity that the Sonis' signatures on the forms received by the IRS are correct and valid. See Malachinski v. Commissioner, T.C. Memo. 1999-182, 1999 WL 349342, at *3-*4, aff'd, 268 F.3d 497 (7th Cir. 2001); see also sec. 6064. The burden of proof is on the Sonis to prove that the power of attorney was invalid. See Pleasanton Gravel Co. v. Commissioner, 85 T.C. 839, 854 (1985); Lefebvre v. Commissioner, T.C. Memo. 1984-202, aff'd, 758 F.2d 1340 (9th Cir. 1985).

On or about March 20, 2008, Mr. Grossman provided the Commissioner with a Form 2848 authorizing him to act as the Sonis' representative. He provided the Form 2848 along with the first extension (i.e., the first Form 872). Although the IRS received both forms on March 20, 2008, all signatures on the Form 2848 were dated April 10, 2006. The first extension, on the other hand, was dated

[*25] March 20, 2006.  IRS employee Rosalie Miller, who received the forms, prepared handwritten notes indicating that "Rep-Grossman--executed/signed 872 using date of 3/20/06 [yet the] POA [power of attorney] was not valid until 4/10/06."  Appeals Officer Gerard Fitzgerald found that Mr. Grossman "actually signed in 2008."  This finding is bolstered by the fact that the first extension form was not prepared or provided to the Sonis until May 2007, making it impossible for Mr. Grossman to have signed it in 2006.  Om has not provided any supporting evidence regarding the signatures, other than his testimony and Mr. Grossman's testimony.  Mr Grossman could not remember whether he had had Om sign the Form 2848 or had signed the Sonis' names himself.  He testified that if he had signed the names of the Sonis, it was for expediency.[16]

While Om claims he did not sign the Form 2848, the Court does not simply accept his unsubstantiated self-serving testimony.[17]  See Tokarski v.

---

[16]Mr. Grossman testified that it was common practice for him to sign Forms 2848 for his clients.  Mr. Grossman was often confused at trial, and we did not find him to be a credible witness.

[17]This Court did not find Om to be a credible witness.  He testified that he did not know that Anjali's signature was not hers on 19 tax documents presented at trial and that he never discussed the issue regarding the 2004 return with her. He testified that Anjali did not have a foreign bank account until he was asked whether he was "100 percent sure."  Then he immediately remembered detailed information including that there was a Swedish account, that it had substantial loss

(continued...)

[*26] Commissioner, 87 T.C. 74, 77 (1986) (concluding that the Court is not required to accept uncorroborated or self-serving testimony as reliable and true). "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." Kropp v. Commissioner, T.C. Memo. 2000-148, 2000 WL 472840, at *3. Here, Mr. Grossman did not remember whether he had signed the Form 2848 on behalf of the Sonis; however, he did sign the Sonis' names on the second Form 872 in addition to his own. The signatures on the second Form 872 are markedly different from those on the Form 2848, and Om's signature on the Form 2848 is similar to those he admits are his. We find that the Sonis did not meet their burden of proof to show that Om did not sign the Form 2848.

We next delve into the question of whether Mr. Grossman should also be considered Anjali's representative and whether both Om and Anjali ratified that representation.

### 2. Implied Authority and Ratification

Whether a representative has authority to act on behalf of a taxpayer is a factual question to be decided according to the common law principles of agency.

---

[17](...continued)
amounts that the losses were incurred in a particular year.

[*27] <u>Trans World Travel v. Commissioner</u>, T.C. Memo. 2001-6, 2001 WL 40099, at *7; <u>Estate of Quirk v. Commissioner</u>, T.C. Memo. 1995-234, 1995 WL 325622, at *5; <u>see also</u> <u>Kraasch v. Commissioner</u>, 70 T.C. 623, 627-629 (1978). Actual authority is given by express statements, and implied authority is derived by implication from the principal's words or deeds. <u>Dahl v. Commissioner</u>, T.C. Memo. 1995-179, 1995 WL 225567, at *3, <u>aff'd</u>, 85 F.3d 643 (11th Cir. 1996); <u>DiSanza v. Commissioner</u>, T.C. Memo. 1993-142, 1993 WL 99971, at *9, <u>aff'd</u>, 9 F.3d 1538 (2d Cir. 1993). A taxpayer has a "duty to repudiate the consent as soon as he learn[s] of it if he had not authorized it." <u>Lyon v. Commissioner</u>, T.C. Memo. 1994-351, 1994 WL 387151, at *4 (citing <u>Mishawaka Props. Co. v. Commissioner</u>, 100 T.C. 353, 366 (1993), and 1 Restatement, Agency 2d, sec. 43 (1957)).

Om repeatedly indicated to representatives of the IRS that he wanted Mr. Grossman to handle issues related to the Beauville Corp.'s loss deduction claimed on the 2004 return. Anjali on the other hand allowed Mr. Grossman to act on her behalf. Importantly, Mr. Grossman could not have mailed in the first extension of the period of limitations for assessment of tax without the Sonis' knowledge because he did not receive a copy; rather, it was mailed directly to the Sonis at their home address. The Commissioner's records did not show Mr. Grossman held

**[\*28]** a POA until March 20, 2008, when the Form 2848 was received.  Because the RA could not verify that he was the Sonis' representative, he did not send Mr. Grossman the first extension; it was sent to the Sonis.  The only possibility for Mr. Grossman to have received the unexecuted first extension was for Om, Anjali, or someone associated with them to have given it to him.  He then signed it and mailed it to the RA with a copy of the executed Form 2848.  Thereafter, the IRS sent copies of the countersigned first and second extensions to the Sonis' residence.  They would have been alerted that Mr. Grossman's name and signature were on the document.  Neither of the Sonis tried to contact the RA or anyone associated with the IRS to repudiate Mr. Grossman's representation that he was their authorized representative for signing the Forms 872, and they did not attempt to correct the misperception, if any, that Mr. Grossman was their representative.

Furthermore, Om implied that Mr. Grossman was his representative by treating him as such throughout this case.[18]  In January 2012 Om signed a protest letter that Mr. Grossman drafted concerning the Sonis' personal tax returns.  In April 2013 Mr. Grossman sent additional information regarding the Beauville Corp. loss to the IRS on the Sonis' behalf.  On August 15, 2013, the IRS received

---

[18]We note that Kunal was also added as a representative for Om and Anjali in December 2015.

[*29] a handwritten letter from Om attaching copies of two pieces of Mr. Grossman's prior correspondence to the IRS on the Sonis' behalf (dated April 24 and August 7, 2013). Shortly after the petition was filed, Om, Kunal, and Mr. Grossman met on December 9, 2015, with respondent's counsel to discuss the case.

On the eighth and last Form 872, which Om signed, he named Mr. Grossman as the Sonis' representative. The Sonis never questioned any of the activities performed by Mr. Grossman on their behalf. To only now state that he was not their representative is beyond the pale.

Om consistently acted as if Mr. Grossman was the Sonis' representative regarding the 2004 tax year. Om continued to work with Mr. Grossman throughout the audit process and treated Mr. Grossman as his representative. Therefore, even if the Sonis did not personally sign the Form 2848 they gave implied authority to Mr. Grossman.

As for Anjali, as discussed supra pp. 14-20, Anjali gave her husband tacit consent to take care of the tax matters, and we might be able to rely on that authority to conclude Om authorized Mr. Grossman's representation for Anjali. However, Anjali's actions likewise ratified the representation. See Shopsin v. Commissioner, T.C. Memo. 1984-151, 1984 Tax Ct. Memo LEXIS 522,

**[*30]** at *12-*13 (finding that the taxpayers' "actions, and in some instances their inaction, effectuated a ratification"), aff'd without published opinion, 751 F.2d 371 (1984). She too remained silent and allowed the IRS the rightful perception that Mr. Grossman was an authorized representative of the Sonis acting on both their behalves.

The Sonis additionally argue that Mr. Grossman forged their signatures. Generally, raising an issue long after a supposed forgery is evidence in the Commissioner's favor. See Malachinski v. Commissioner, 1999 WL 349342, at *3-*6. Furthermore, if a taxpayer would have ratified the powers of attorney if requested to do so or would have signed new powers of attorney, this Court does not view the signature as a forgery. Slawek v. Commissioner, T.C. Memo. 1987-438, 1987 Tax Ct. Memo LEXIS 435, at *13-*15. Further, an extension request which is itself defective may also be ratified by subsequent actions of a taxpayer. Ryan v. Commissioner, T.C. Memo. 1991-49, 1991 Tax Ct. Memo LEXIS 68, at *12. This Court has long held that by allowing an individual to present himself before the IRS as the taxpayer's representative, the taxpayer is approving the action and adopting the powers of attorney as his own. See Slawek v. Commissioner, 1987 Tax Ct. Memo LEXIS 435, at *14-*15. A taxpayer must act

**[*31]** because the IRS is forced to rely on apparently valid powers of attorney and in so doing acts to its detriment. Id. at *15.

The Sonis treated Mr. Grossman as their representative throughout the appeal and litigation process, and they did not contest the first two Forms 872 until well over a decade later. Om acted as if Mr. Grossman was his authorized representative, and Anjali provided her tacit consent for Om to act on her behalf. Because Om authorized Mr. Grossman's representation, Anjali also tacitly consented, through Om's agency. The Sonis therefore ratified the Forms 2848, making the subsequently signed extension requests valid.

### 3. First Extension Dated "3/20/06"

Lastly, the Sonis argue that even if the Form 2848 is valid, the date on the first extension makes that extension invalid. On the first extension the date next to Mr. Grossman's signature appears to be March 20, 2006. They propose that Mr. Grossman did not have authority as of March 20, 2006, because the Form 2848 was signed afterward, on April 10, 2006. Because the first extension was prepared and mailed to the Sonis on May 16, 2007, it was factually impossible for Mr. Grossman to have signed it in 2006. It is apparent that Mr. Grossman mistakenly dated his signature on the first extension as March 20, 2006, when he meant March 20, 2008, which is the date the first extension was provided to the RA.

**[\*32]** Because of this scrivener's error in the dated signature, the Sonis argue that the Commissioner was on notice that there was an issue with the first extension. They point to notes written by IRS employee Rosalie Miller that identified the timing issue. We do not find this argument persuasive. We find that the March 20, 2006, date was a scrivener's error and therefore the extension was still valid.

Furthermore, the Sonis' actions demonstrate that they ratified the Form 2848, first extension, and second extension. As discussed supra pp. 26-31, taxpayers may ratify by acting as if the Form 2848 or the Form 872 were authorized, or by not taking actions to correct the mistakes as they were presented to them.

In this case the record reflects the Sonis' overt actions of treating Mr. Grossman as their representative for extending the period of limitations for assessment of tax on multiple occasions. Om and Kunal signed an additional six Forms 872 with the express purpose of extending the period of limitations for the 2004 return, and the Commissioner relied on those seemingly valid extensions to his detriment.

### 4. Om's Implied Authority To Act on Behalf of Anjali

As discussed supra pp. 26-31 a taxpayer may give an individual implied or express authority to act on his or her behalf. The Sonis also argue that the Form

[*33] 2848 and Form 872 are invalid as to Anjali. Anjali repeatedly stated that she trusted her husband to handle the financial matters, which included the tax matters. As part of their relationship Anjali choose to give her husband the authority to handle those tax matters, which included signing the Forms 872. She said she would continue to trust Om with the tax matters going forward. While Anjali may not have expressly given her husband authority to sign specific forms, it was well understood that Anjali gave him the implied authority to act on her behalf.

Furthermore, she may not sit idly by; she had a duty to address items as they become known to her. See Lyon v. Commissioner, 1994 WL 387151, at *4. Anjali handled the household mail, which would have included correspondence from the IRS in her name. She would have received the copies of the fully executed Forms 872 sent to her address in her name. She chose to ignore tax matters even when items were addressed to her in the mail. In addition this Court has found that where an individual, in this case Om, had implicit authority to sign for a taxpayer and the taxpayer did not contest or otherwise alert the IRS to the lack of authority in a timely manner, the taxpayer has ratified that authority. See Shopsin v. Commissioner, 1984 Tax Ct. Memo LEXIS 522, at *21-*22 (finding that the taxpayers' accountant acted within the scope of his employment by

**[*34]** signing a petition and acted as the authorized agent in filing that petition).

In <u>Shopsin</u> we found that a husband implicitly authorized his wife to sign his name on a Form 2848 and several other documents and that he ratified that authority by not raising the limitations issue until several weeks after he sought to invalidate his signature on a stipulated decision that he did in fact sign. <u>Id.</u> Similarly here, we find that Anjali gave implicit authority to her husband to act on her behalf in ratifying the Form 2848 that gave Mr. Grossman authority to act as her representative. She also personally ratified any actions of Mr. Grossman by not timely addressing the limitations issue anytime before trial.

> B. <u>Conclusion on Extending the Period of Limitations for Assessment of Tax</u>

The Sonis did not meet their burden of proof under Rules 39 and 142(a). Om signed the Form 2848 authorizing Mr. Grossman to be his representative, gave implied authority for Mr. Grossman to act on both the Sonis' behalf, and ratified Mr. Grossman's authority as their authorized representative. Om knew that Mr. Grossman was acting on his behalf. Therefore, Om may not now claim that the Forms 872 are invalid.

Anjali relied on her husband to handle financial and tax matters. Om then gave authority to Mr. Grossman to act as the representative for him and Anjali.

[*35] Neither of the Sonis challenged Mr. Grossman's authority until almost a decade after they were aware of Mr. Grossman's acting on their behalf. The eight executed Forms 872 properly extended the period of limitations for assessment and therefore the period of limitations did not expire before the issuance of the SNOD.

III.    Section 6651(a)(1) Addition to Tax

The Sonis argue that they should not be liable for the addition to tax under section 6651(a)(1) because they thought they did not owe any tax.[19] Section 6651(a)(1) imposes an addition to tax for a taxpayer's failure to file a required Federal income tax return on or before the specified filing date, including extensions. Respondent bears the burden of production with respect to any addition to tax, sec. 7491(c), and may satisfy this burden of production by demonstrating that the tax return was filed after its due date, Wheeler v. Commissioner, 127 T.C. 200, 207-208 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Higbee v. Commissioner, 116 T.C. at 447. Here, the record reflects that the

_____

[19]The Sonis also argue that Anjali would not be subject to the sec. 6651(a)(1) addition to tax because she had no filing responsibility for the 2004 tax year. The record does not establish whether Anjali did or did not have a filing responsibility for 2004. Therefore, we could not determine that she did not. Regardless, Anjali and Om jointly filed the 2004 return and therefore both are responsible for the addition to tax. See Okorogu v. Commissioner, T.C. Memo. 2017-53, at *14-*16.

[*36] Sonis received extensions of time pursuant to section 6081 allowing them to file their 2004 tax return on or before October 17, 2005.  The Sonis mailed their return on November 10, 2005.  Thus, respondent met his burden of production in this case, and the burden is now on the Sonis to prove that an exception to the section 6651(a)(1) addition to tax applies.

The application of the section 6651(a)(1) addition to tax may be avoided if the taxpayer shows that the failure to timely file was due to reasonable cause and not due to willful neglect.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Reasonable cause exists if the taxpayer exercised ordinary business care and prudence but nevertheless could not file.  Id.  The burden of showing reasonable cause under section 6651(a)(1) remains with the Sonis.  See Higbee v. Commissioner, 116 T.C. at 447.

Reasonable cause for delay is established where a taxpayer is unable to file despite the exercise of ordinary business care and prudence.  Bassett v. Commissioner, 67 F.3d 29, 31 (2d Cir. 1995), aff'g 100 T.C. 650 (1993); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  "Willful neglect" has been defined as a "conscious, intentional failure or reckless indifference."  United States v. Boyle, 469 U.S. 241, 245 (1985).  Whether a failure to file timely is due to reasonable

**[\*37]** cause and not willful neglect is a question of fact. <u>Id.</u> at 249 n.8; <u>Crocker v. Commissioner</u>, 92 T.C. 899, 913 (1989).

The Sonis did not have a reasonable explanation for filing late. They thought no harm no foul because they would have zero tax due, but this is not a reasonable cause for the delay. Consequently, no reasonable cause exists. <u>See, e.g.</u>, <u>Frey v. Commissioner</u>, T.C. Memo. 2019-62. We therefore conclude that the Sonis are liable for the addition to tax under section 6651(a)(1).

IV.    <u>Section 6662(a) Accuracy-Related Penalty</u>[20]

Respondent determined a penalty under section 6662(a) and (b)(1) or (2) for the 2004 tax year in an amendment to his answer lodged with the Court on July 12, 2017. The amendment was authorized by the Court on August 9, 2017. Respondent bears the burden of production with respect to an individual taxpayer's liability for any penalty and the burden of proof with respect to any new penalty pleaded in his answer. <u>See</u> sec. 7491(c); Rule 142(a)(1). Furthermore, section 6751(b)(1) requires written supervisory approval of a "penalty determination no later than the date the IRS issues the notice of deficiency (or files

---

[20]Again the Sonis argue that Anjali did not have a filing requirement and therefore is not subject to any penalty. As discussed <u>supra</u> note 19, nothing in the record supports or refutes Anjali's having a filing requirement. Consequently, we are not obliged to address this argument.

**[*38]** an answer or amended answer) asserting such penalty." <u>Chai v. Commissioner</u>, 851 F.3d 190, 221 (2d Cir. 2017), <u>aff'g in part, rev'g in part</u> T.C. Memo. 2015-42. The record reflects and petitioners concede that respondent's employee secured timely supervisory approval for the penalty.[21]

Section 6662(a) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a return that is attributable to either negligence or disregard of the rules or regulations under section 6662(b)(1) or a substantial understatement of income tax under section 6662(b)(2). Section 6662(c) defines "negligence" to include any failure to make a reasonable attempt to comply with tax laws, and section 1.6662-3(b)(1), Income Tax Regs., includes any failure to keep adequate books and records or to substantiate items properly. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Here, the Sonis did not keep adequate records and conceded the underlying tax; their tax understatement was substantial.

However, this section 6662(a) accuracy-related penalty does not apply if the taxpayers show they acted with reasonable cause and in good faith in filing their

---

[21]The requirements of sec. 6751(b) were satisfied and have not been challenged by petitioners.

**[\*39]** return. Sec. 6664(c)(1). This reasonableness analysis takes into account the taxpayers' experience, knowledge, and education. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable reliance upon the advice of a tax professional may also establish reasonable cause and good faith. Id. para. (c). The Sonis allege that they relied on their accountants Mr. Crisci and Mr. Grossman to file a correct return.

To show reliance on an adviser, a taxpayer must prove that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer gave the adviser the necessary and accurate information, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

The Sonis failed to show reliance on an adviser because they failed to provide Mr. Crisci or Mr. Grossman necessary and accurate information. The Sonis suggest that because Om delegated most tasks, he should not be held responsible for the misstatement.

Om is a highly educated businessman. The Sonis claimed a $1,777,789 loss deduction from Beauville Corp. on their 2004 Federal income tax return. Om was aware that he should have kept records of the Beauville Corp. and admitted that he did not keep proper records of this transaction. In correspondence with

**[\*40]** respondent Om indicated that the Beauville Corp. transactions were "based on trust and not properly documented the way a normal business transaction would be." No documents were produced at trial. Mr. Crisci, Om's outside tax preparer, had asked the Sonis to provide the information relating to Beauville Corp. The Sonis worked with Mr. Grossman to provide what information they could to Mr. Crisci. However, the Sonis may not use Mr. Grossman or Mr. Crisci as a shield for their failure to keep proper records. Their actions were not reasonable or in good faith. Therefore, the Sonis were negligent because they failed to keep proper records. They also substantially understated their income tax. We accordingly conclude the Sonis are liable for the section 6662(a) penalty.

## V.    Conclusion

We conclude that the Sonis filed a valid joint return, the period of limitations under section 6501(a) and (c)(4) did not expire before the issuance of the SNOD, the Sonis owe the addition to tax under section 6651(a)(1), and they owe a 20% accuracy-related penalty under section 6662(a).

In reaching our decision we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant, moot, or without merit.

**[\*41]** To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.